902 A.2d 900

JOHN W. HARDWICKE, JR. AND TERRI S. HARDWICKE, PLAIN-
TIFFS–RESPONDENTS, v. AMERICAN BOYCHOIR SCHOOL,
DEFENDANT–APPELLANT, AND DONALD HANSON, RICH-
ARD BRENNER, THOMAS CONLIN, DONALD PROFITT,
DAVID SCHUSTER, J. BRUCE MELLINGER, HOWARD A.
JEWELL, HAROLD JONES AND THE COOK IDENTIFIED AS
"ED" OR "JOHN" JOHN DOES 1–10 AND JOHN DOES 11–20,
DEFENDANTS.

Argued November 29, 2004—Decided August 8, 2006.

72

*Jay H. Greenblatt* argued the cause for appellant (*Greenblatt & Laube,* attorneys).

*Lawrence Lessig,* a member of the Illinois bar, argued the cause for respondents (*Piper Rudnick,* attorneys; *Mr. Lessig, Keith E. Smith* and *Robert A. Assuncao,* of counsel and on the briefs).

*Martin F. McKernan, Jr.,* submitted a brief on behalf of amicus curiae, New Jersey Catholic Conference (*McKernan, McKernan & Godino,* attorneys; *Mr. McKernan* and *James J. Godino, Jr.,* on the brief).

Chief Justice PORITZ delivered the opinion of the Court.

For about two years, from the fall of 1969 to April 1971, John W. Hardwicke was a boarding student at the American Boychoir School (the Boychoir School or School)[1] in Princeton, New Jersey. Hardwicke was twelve years old when he arrived, and forty-three years old in 2001 when he filed suit against the Musical Director Donald Hanson, the School, and persons connected with the School and Hanson, claiming that he had been repeatedly sexually abused by Hanson and others, and that the School knew, or should have known, of the abuse.

The trial court held that only natural persons are potentially liable under the Child Sexual Abuse Act (CSAA), *N.J.S.A.* 2A:61B–1, and that, in any case, the Charitable Immunity Act (CIA), *N.J.S.A.* 2A:53–7 to –11, immunizes the School from liability for intentional torts whether the claim is based on the CSAA or the common law. A majority of the Appellate Division reversed, *Hardwicke v. Am. Boychoir Sch.*, 368 *N.J.Super.* 71, 77, 845 *A.*2d 619 (App.Div.2004), and we today affirm that judgment. We hold that Hardwicke has alleged facts sufficient to overcome dismissal of his case as to the School, both under the CSAA and the common law, and that neither the CIA nor the CSAA bars his claims as a matter of law.

## I.

The trial court granted motions for summary judgment brought by the School. After the split decision in the Appellate Division, this Court granted the parties' consolidated interlocutory appeals. 180 *N.J.* 446, 852 *A.*2d 186 (2004). Because the issues presented were decided below on summary judgment, "we must view the facts that may be inferred from the pleadings and discovery[ ] in the light most favorable to" the non-moving party, here the plaintiff, John Hardwicke. *Strawn v. Canuso*, 140 *N.J.*

---

[1] During the period of Hardwicke's attendance, the School was known as the Columbus Boychoir School.

43, 48, 657 *A.2d* 420 (1995); *see Baird v. Am. Med. Optics,* 155 *N.J.* 54, 58, 713 *A.2d* 1019 (1998). Those facts in the record and relevant to the issues to be decided by the Court follow.

### A.

Founded in 1937, the Boychoir School provides a highly specialized musical and choral education for young boys (grades five through eight), while also offering the standard academic curriculum appropriate at those grade levels. It boasts an internationally renowned touring choir that has performed for the President of the United States and the Pope. Because of its prestige, the choir brings in substantial revenues, thereby serving as an important funding resource for the School. During the 1960s and '70s, approximately fifty students attended the School, which is located in a fifty-room Princeton mansion and adjunct buildings. Those boys who were full-time boarders and members of the touring choir resided in the mansion both during the week and on weekends, and were supervised by faculty and staff, including university student "proctors" who resided there as well. At that time, the principal administrators of the School were the Headmaster and the Music Director.

In 1968, the year before plaintiff was enrolled at the School, the Music Director was fired because he engaged in what the School described as a "love affair" with a student. At the behest of a wealthy benefactor, in 1970 the Board hired Donald Hanson as Music Director, a position he held until 1982.[2] During Hanson's period of employment, he appears to have functioned as the School's "alter ego." In addition to controlling the musical program and associated tours and serving as the conductor of the Concert Choir, Hanson performed a wide variety of key administrative and educational tasks, such as running the admissions

---

[2] Whether there was a Musical Director from 1968 to 1970 is unclear; the School indicates that it fired the prior Director "immediately" and did not hire Hanson until 1970. "Music Director" was the designation used in the employment contract Hanson signed on July 26, 1970.

office and hiring and firing staff. As a condition of employment, he was required to reside in the mansion and to be there at night and on weekends. In respect of Hanson's role at the School, a past headmaster has stated that Hanson "alone held the School together during the early seventies," whereas a student who attended in the 1970s has explained that "as far as the boys were concerned, [Hanson] was certainly the person in control."

Hanson sexually abused Hardwicke on an almost daily basis and sometimes several times a day between October 1, 1970, and April 1971, at the School, on School-sponsored field trips and in Hanson's car, among other places. To a lesser extent, other school staff (a former headmaster, a teacher, and a cook) and two of Hanson's friends, also abused Hardwicke. Hardwicke contends that the School not only condoned that behavior, but fostered a "sexually charged atmosphere" of teacher-on-student and student-on-student abuse; that Hanson and others "preyed on young boys ... because they knew [the boys] were alone and vulnerable[;]"; and that, in light of his age, he was incapable of consent. He asserts that before Hanson was hired, the School knew that staff had abused students and that Hanson was brought to the School even though his pedophilic tendencies were known or should have been known. He also asserts that Hanson's abuse of students was "open, frequent and prolonged;" that a "significant number of employees other than Hanson" sexually abused students; and that "the [S]chool was sufficiently small that the abuse could not have continued unnoticed." *Hardwicke, supra,* 368 *N.J.Super.* at 79, 845 *A.*2d 619. Based on those facts, Hardwicke claims that the School and its agents and employees stood *in loco parentis* to the students who lived there and that the School had a non-delegable duty to protect them from harm.

In addition to the abuse that occurred when Hardwicke was a student, Hanson abused Hardwicke during the summer of 1971. Shortly after Hardwicke left the School he called Hanson, who drove to Hardwicke's family home in Maryland and brought him back to the School. There, over the course of two weeks, Hanson

shared sleeping accommodations with the fourteen-year-old boy and performed various sex acts on him at different locations around the School and elsewhere. After that summer Hardwicke had no further contact with Hanson.

Ten years later, in November 1981, the parents of a then current student reported to the School that Hanson had sexually abused their son. The Board of Trustees held a special meeting on November 8, 1981, and adopted a plan of action that required Hanson immediately to move off-campus, to seek counseling, to be not alone with students, and to be always accompanied by a proctor when on campus. The Board decided, however, that Hanson would remain as Music Director until the completion of the choir's major tour in March 1982 because the School's financial security depended on the tour and because the Board believed that students were well-protected by the new policies. While the Board was investigating the November 1981 claim, the mother of another student reported that her son had been abused by Hanson. Although Hanson initially denied any wrongdoing, he eventually admitted inappropriate behavior toward the second boy. Both families' complaints were kept confidential by the School.

After the choir returned from its tour, in a letter dated March 28, 1982, the School's Headmaster informed parents that Hanson had resigned for "reasons of personal health ... effective ... June 20, 1982." The parents were told that Hanson had been given a "medical leave of absence" from March 28 through June 20, and that it was "unfortunate" Hanson was "unable to complete the current year." The letter also stated:

> Donald's contributions to the School over the years have been monumental. In fact, as many parents are aware, he alone held the School together during the early seventies: acting as executive director as well as music director, hiring and firing staff, running the admissions and concert offices, from time to time driving the bus and occasionally even washing the dishes—and all the while by slow degrees rebuilding a choir that soon became recognized internationally as we know it today. His story at the Boychoir School is one of total devotion to the boys and dedication to the best interests of the School. He held the School together while the Board of Trustees rediscovered its own mission, and he deserves our heartfelt thanks for all he has done.

Then, between 1982 and 1999, two other students came forward with claims against school employees. Sometime in the early 1980s, one of the students informed the School that he had endured daily abuse by a proctor. There was no response from the School. The other student sued the School and Hanson, alleging that Hanson had abused him and other boys. The School reportedly settled the suit for $875,000. More recently, a former student described an incident in which a Headmaster had roused him and other students from their beds and paddled them for engaging in sexual activity with Hanson. That student's father came to the School when his son called to report the paddling but was not told the reason for the Headmaster's action.

The record informs us that the School did not notify students or parents about the abuse until April 2000. Hardwicke asserts that the lack of notice not only demonstrates the School's disregard for the students under its care, but prolonged the students' trauma because they were unable to seek treatment as soon as they might have. He claims that he has suffered severe emotional harm as well as physical pain, and that the abuse, occurring when he was barely sexually mature, caused him to be confused about his sexuality for the remainder of his childhood and for most of his adult life. Hardwicke states that Hanson "convinced" him that he "shouldn't tell ... [and] that it was something [he] wanted to do." He believed that he was to blame for what happened to him.

It was not until October 15, 1999, that plaintiff informed the School about the abuse he had endured. Although President John Ellis [3] did not respond directly to Hardwicke, he provided information for the first time by way of an April 2000 letter to all School alumni who had attended during Hanson's tenure. Ellis explained:

In 1982, our School dismissed a senior staff member after two students separately reported that he had had inappropriate sexual contact with them. Since then, at different times, two additional students (by then, alumni) have reported similar

---

[3] John Ellis became President of the School in 1990, eight years after Hanson left.

> problems with the same man. None of these former students has chosen to file criminal charges, and each has requested confidentiality.
>
> Late last year, I received a telephone call from a graduate from the early 1970s who told me that when he was a student he was sexually abused by the same man.

Ellis indicated that the School had hired outside consultants, including mental health professionals and attorneys, and had reported the allegation to the New Jersey Division of Youth and Family Services (D.Y.F.S.). He also encouraged those with "any information or any concerns regarding inappropriate behavior that may have occurred" during their time as students to contact the School. When one former student notified the School that he had been abused, Ellis revealed that he had received "many, many difficult phone calls" in response to his letter.

## B.

On January 31, 2001, John W. Hardwicke and his wife, Terri S. Hardwicke, sued Donald Hanson, the School, and twenty other unnamed defendants. Later, on October 21, 2002, the Hardwickes amended the complaint, substituting certain former employees for John Doe defendants. John Hardwicke sought compensatory and punitive damages based on violation of the CSAA, *N.J.S.A.* 2A:61B–1 (Count I); intentional infliction of emotional distress (Count II); negligent infliction of emotional distress (Count III); breach of the duty to disclose the abuse committed by Hanson on students, and active concealment of that abuse (Count IV); assault and battery (Count V); negligent hiring and supervision (Count VI); and false imprisonment (Count VII). Terri S. Hardwicke made a claim for loss of consortium (Count VIII). Also, in 2002, Douglas Palmatier, who attended the School from 1971 (when he was nine) to 1977, sued Hanson and the School, among others, claiming that Hanson had sexually abused him daily, and sometimes, more than once a day. Although Palmatier's allegations were substantially similar to those of Hardwicke, the suit filed by Palmatier was styled as a class action brought on behalf of those former students who were sexually abused at the School between 1970 and 1982.

Hanson, who resides in Canada, was served with Hardwicke's complaint in 2001. He has not filed a responsive pleading and Hardwicke has not sought a default judgment against him. The School filed answers to Hardwicke's complaint and amended complaint, and then followed with motions for summary judgment on all Counts except Count IV (breach of the duty to disclose). First, the School contended that Hardwicke's common-law claims (Counts II, III, V, VI, VII, and VIII) were time-barred because he should have brought them by 1977, within two years after he reached the age of majority, as required by *N.J.S.A.* 2A:14–2. On February 8, 2002, the trial court denied the School's motion. The court found that Hardwicke's common-law claims were "based on" sexual abuse and therefore covered by the statutory accrual provision of the CSAA, *N.J.S.A.* 2A:61B–1b, and, further, that there were contested factual issues as to when Hardwicke should have reasonably discovered the relationship between the abuse and his injuries.[4]

On motion for reconsideration, the School argued that the CSAA did not apply to it because the School is not a "person standing *in loco parentis* within the household who knowingly permit[ted] or acquiesce[d] in sexual abuse." *N.J.S.A.* 2A:61B–1a(1). After further review, on June 14, 2002, the trial court granted the School's motion in respect of the applicability of the CSAA (Count I). Although the court found that the School qualified as a "household," and that it stood *"in loco parentis"* to the students, it held that the word "person" in the CSAA refers only to "natural persons" and not corporations or institutional entities. It therefore followed, and the court so held, that Hardwicke could not make out a claim against the School under the

---

[4] *N.J.S.A.* 2A:61B–1b states: "In any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse. Any such action shall be brought within two years after reasonable discovery." Although plaintiff was conscious of the abuse, he alleges that he was not aware of the relationship between the abuse and his psychological and other injuries until, at the earliest, the fall of 1999.

CSAA. The court also granted partial reconsideration in favor of the School and held that plaintiff's remaining common-law claims (Counts II, III, V, VI, VII, and VIII) did not trigger *N.J.S.A.* 2A:61B–1b, the more generous accrual provision of the CSAA, because there was no cause of action under the CSAA in the first instance. Nonetheless, the court denied without prejudice the School's motion for summary judgment pending an evidentiary hearing to determine whether the statute of limitations had tolled on equitable grounds under *Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.2d* 563 (1973).

On January 6, 2003, the trial court dismissed Hardwicke's common-law claims against the School as barred by the CIA. The court rejected plaintiff's contention that the CIA improperly deprives a particular class of injured parties—charity beneficiaries—of the right to access the courts under the Federal Constitution, specifically the Petition Clause of the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, or the analogous provisions of the State Constitution. Ultimately, the court held that the School was immune from suit under the CIA even when its employees and agents "acted willfully, wantonly, recklessly, indifferently [or] criminally." Concerning the abuse of Hardwicke during the summer of 1971 (in relation to Counts II, V, and VII), the court further held that the School was not vicariously liable for Hanson's actions because Hardwicke was either Hanson's personal guest during that time and, therefore, Hanson was not acting within the scope of his employment, or, Hardwicke was not a personal guest and Hanson was acting within the scope of his employment but the School was immune under the CIA as Hardwicke was a beneficiary of the School.

When the last of Hardwicke's remaining claims against the School were dismissed, he sought leave to appeal.[5] The Appellate Division granted leave and consolidated his appeal with Palmati-

---

[5] Terri Hardwicke did not take an interlocutory appeal after the trial court dismissed her claim.

er's appeal as of right. *Hardwicke, supra,* 368 *N.J.Super.* at 76, 845 *A.*2d 619. After oral argument, Palmatier settled with the School. *Id.* at 77, 845 *A.*2d 619.

## C.

On March 26, 2004, in three separate opinions, a divided panel of the Appellate Division reversed in part, affirmed in part, and remanded the matter to the trial court for further proceedings. In the principal opinion, Judge Payne held, as had the trial court, that under the CSAA the School "operated in an *in loco parentis* capacity," *id.* at 86, 845 *A.*2d 619, and, further, "effectively acted as the 'household' within which the abusive conduct occurred." *Id.* at 87, 845 *A.*2d 619. On the question whether the CSAA applies only to natural persons, Judge Payne rejected the lower court's reading of the statute. She observed that although the CSAA was enacted in response to abuse by a natural person, neither the legislative history nor the language of the statute suggests that the CSAA is restricted to natural persons. *Id.* at 88–89, 845 *A.*2d 619. Relying on the purpose of the CSAA to provide a statutory cause of action for childhood sexual abuse and the lack of specific limiting language in the CSAA, the principal opinion adopted the broad definition of "person" found at *N.J.S.A.* 1:1–2 that includes "corporations, companies [and] associations ... as well as individuals," and held that the School is a person under the CSAA.

Having held that Hardwicke stated a cause of action under the CSAA, Judge Payne turned to the question whether the CIA nonetheless barred his lawsuit. Concerned that our opinion in *Frugis v. Bracigliano,* 177 *N.J.* 250, 827 *A.*2d 1040 (2003), had recognized as fundamental a school board's "heightened duty" to protect the children in its care, she chose to construe the statute to avoid an unconstitutional result.[6] In that vein, the principal opinion stated:

---

[6] *Frugis* involved an action against a local Board of Education for "negligent hiring, negligent supervision, and vicarious liability" in connection with the

In the present case, the [CIA] ... need not be read so as to insulate the school from substantial liability, since the [CIA] does not address liability premised on either a statutory violation requiring knowing conduct or a common law violation involving intentional or other non-negligent conduct. As a consequence, the constitutional concerns ... can be more directly addressed as a matter of statutory interpretation.

[*Hardwicke, supra,* 368 *N.J.Super.* at 95, 845 *A.*2d 619.]

As a matter of statutory interpretation, then, Judge Payne determined that the passive abuse provision of the CSAA is premised on a finding of "knowing" conduct and "that the [CIA], by its terms, provides insulation only from liability as the result of 'damage from ... negligence'—a common-law theory of liability." *Id.* at 95–96, 845 *A.*2d 619.

Judge Payne also held that the CIA does not bar Hardwicke's common-law causes of action based on intentional conduct, similarly reasoning that the CIA only bars common-law claims based on negligence and not "claims of intentional conduct by or attributed to the ... School arising out of sexual abuse, insofar as those claims are independent from those asserted under the [CSAA]." *Id.* at 102, 845 *A.*2d 619. She observed that

no reported decision ... has held that a charitable institution is immune from suit by its beneficiaries when that suit is based on the institution's own intentional conduct or intentional conduct attributed to it through agency doctrine: conduct requiring a different degree of scienter from that based upon negligence concepts. [*Ibid.* (citations omitted).]

Regarding whether the School was vicariously liable for Hanson's intentional acts during the summer of 1971, Judge Payne found that if Hanson's conduct was intentional, the CIA did not bar his claims, and if his conduct was unintentional, there were factual issues as to whether Hardwicke was a beneficiary of the School at the time. *Id.* at 103–04, 845 *A.*2d 619. Finally, the principal opinion held that the CSAA's relaxed statute of limita-

---

conduct of an elementary school principal. 177 *N.J.* at 257–58, 827 *A.*2d 1040. In *Frugis,* the Court stated that "[a] board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children." *Id.* at 268, 827 *A.*2d 1040.

tions applies to all of Hardwicke's claims, both statutory and common-law, and "remanded [the case] for further proceedings in accordance with [the court's] opinion." *Id.* at 106–07, 845 *A.*2d 619.

Judge Stern, in a separate opinion, agreed that the School is not immune from suit under the CIA. He found, however, that the CIA generally protects charitable entities from both common-law and statutory claims based on "unlawful and intentional wrongdoing." *Id.* at 107, 845 *A.*2d 619. In Judge Stern's view such acts are immune because "[t]he 1995 amendments to the CIA make clear that the immunity exception ... applies only to individuals," and because prior to the 1995 amendments the statute provided broad immunity that covered "willful and wanton acts, including sexual assault." *Id.* at 108, 845 *A.*2d 619. Nonetheless, he "ha[d] no doubt, in light of *Frugis* ..., that a private not-for-profit school student, abused for the sexual gratification of a person having a role like Hanson's, may bring an action against the school, even though it is a nonprofit educational corporation." *Id.* at 110, 845 *A.*2d 619.

Dissenting, Judge Landau opined that the constitutionality of the CIA has not been called into question by *Frugis. Id.* at 112, 845 *A.*2d 619 (Landau, J., dissenting). He declined "to elevate the duty formulation described ... in *Frugis,* a matter involving a negligent public board of education, to the status of newly declared fundamental rights implicating stringent constitutional protections," *id.* at 114, 845 *A.*2d 619, and concluded that the trial court judgment dismissing Hardwicke's claims should be affirmed, *id.* at 116, 845 *A.*2d 619.

We granted the School's motion for leave to appeal. 180 *N.J.* 446, 852 *A.*2d 186 (2004). Subsequently, on August 3, 2004, we granted the New Jersey Catholic Conference leave to file an *amicus curiae* brief.

## II.

Enacted in 1992, the CSAA, *N.J.S.A.* 2A:61B–1, established the first statutory cause of action for sexual abuse in New Jersey.

Prior to 1992, victims of sexual abuse were limited to common-law theories of assault, battery, and intentional infliction of emotional distress, and constrained by *N.J.S.A.* 2A:14–2, the two-year statute of limitations for tort actions. In 1990, however, the Appellate Division directly confronted the question "whether the mental trauma suffered by [a child victim of sexual abuse] serves to toll the statute of limitations." *Jones v. Jones,* 242 *N.J.Super.* 195, 198, 576 *A.*2d 316 (App.Div.), *certif. denied,* 122 *N.J.* 418, 585 *A.*2d 412 (1990). *Jones* highlighted the difficulties victims then faced when bringing claims against their abusers.

In *Jones,* a daughter sued her parents under available common-law theories alleging abuse by her father and complicity in that abuse by her mother. *Id.* at 197–200, 576 *A.*2d 316. The trial court granted summary judgment for the parents based on the two-year statute of limitations, and the Appellate Division reversed. The panel found "that factual questions were presented" whether the daughter's mental condition prevented her from asserting her rights, thereby tolling the statute of limitations, either because she lacked the capacity to do so or because of duress sufficient to prevent the exercise of "freedom of will." *Id.* at 198, 205, 208–09, 576 *A.*2d 316.

The Legislature responded to the concerns raised in *Jones* with the passage of the CSAA. As reported by the Senate Judiciary Committee in its *Statement to Senate Bill No. 257,* at 1 (Feb. 24, 1992),[7]

[u]nder current law, an action for personal injury must be commenced within two years after the accrual of the cause of action. Because of the unique nature of sexual abuse, which may only be discovered by an adult victim after years of repression, the bill provides that a civil suit for sexual abuse shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse. Any such action must be brought within two years after reasonable discovery.

In addition, the bill provides that a court would be able to find that the statute of limitations in a particular case was suspended ("tolled") because of the plaintiff's

---

[7] The *Statement* has been reproduced at *N.J.S.A.* 2A:44 to 2A:65A (West 2000) at 717–19.

insanity, duress by the defendant, or any other equitable grounds. The judge would conduct a hearing, and would be able to order an independent psychiatric evaluation of the victim, in order to make this determination.

In effect, the statute codified and amplified the holding in *Jones* by tailoring the context within which tolling is permitted to the special circumstances of the sexual abuse victim.

The facts in *Jones* also provided the underpinning for the statutory definition of "sexual abuse," although the Legislature addressed the question broadly. Under the CSAA,

"[s]exual abuse" means an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult. A parent, foster parent, guardian or other person standing in loco parentis within the household who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse, except that it is an affirmative defense if the parent, foster parent, guardian or other person standing in loco parentis was subjected to, or placed in, reasonable fear of physical or sexual abuse by the other person so as to undermine the person's ability to protect the child.

[*N.J.S.A.* 2A:61B–1a(1).8]

The CSAA thus establishes two classes of abusers: those persons who inflict the abuse (active abusers), and those persons who stand *in loco parentis* within the household who know of the abuse and who fail to protect the child (passive abusers). The passive abuser, however, can claim an affirmative defense based on a "reasonable fear" of the active abuser as described by the statute. *Ibid.*

Under the CSAA, then, a passive abuser is (1) a person (2) standing *in loco parentis* (3) within the household. *Ibid.* The statute does not define those terms. We, therefore, consider the Legislature's intent, looking first to the language of the statute as "the best indicator of that intent." *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). In so doing,

[w]e ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole. . . .

---

8 Effective August 27, 2004, "foster parent" has been replaced by "resource family parent." *L.* 2004, *c.* 130, § 10.

A court should not "resort to extrinsic interpretative aids" when "the statutory language is clear and unambiguous, and susceptible to only one interpretation. . . ." On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, "including legislative history, committee reports, and contemporaneous construction." [*Id.* at 492–93, 874 *A*.2d 1039 (citations omitted).]

## A.

The parties' arguments in respect of the applicability of the CSAA to the School focus primarily on the question whether an institution, *i.e.*, the School, can be a "person" under the statute. The School maintains that the Legislature intended "natural" persons only, whereas plaintiff maintains that "person" includes both natural and artificial persons such as corporations. In support of its position, the School points out that *N.J.S.A.* 2A:61B–1a(1) provides an affirmative defense for a passive abuser when "the parent, foster parent, guardian or other person standing in loco parentis was subjected to, or placed in, reasonable fear of physical or sexual abuse by the other person so as to undermine the person's ability to protect the child." That defense, the School argues, can only be available to a natural person, not a corporation, as only a natural person can experience fear or be subject to physical or sexual abuse. The School also argues that because "person" appears in a list of terms that includes "parent," "foster parent," and "guardian," which denote only natural persons, "person" similarly must be limited in scope. *See State v. Hoffman,* 149 *N.J.* 564, 584, 695 *A*.2d 236 (1997) (stating that under doctrine of *ejusdem generis* "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words" (citation omitted)).

Plaintiff contends that the doctrine of *ejusdem generis* actually supports a finding that the School is a person within the meaning of the statute. Plaintiff points out that the term "guardian" is not limited in scope but includes the DYFS, a non-natural or artificial person. If, under the CSAA, an entity—DYFS—can qualify as a

"guardian," it follows that the School can qualify as a "person." Conceding that a corporation cannot possess scienter per se, plaintiff notes that its agents can, and that a corporation can only act through its agents. On the question whether only a natural person can assert the affirmative defense provided in the statute, plaintiff asserts that the scope of a statute is not coextensive with a defense permitted by the statute. Finally, plaintiff asks the Court to look no further than the general rules of construction applicable to statutes for the definition of "person." Under *N.J.S.A.* 1:1–2, " 'person' includes corporations ... as well as individuals, unless restricted by the context to an individual as distinguished from a corporate entity or specifically restricted to" such an entity. Plaintiff argues that the CSAA does not restrict the use of "person" either explicitly or by context.

■ The parties' divergent positions demonstrate, and we find, that the meaning of the word "person" is ambiguous. We must therefore look beyond the language of the statute and consider extrinsic evidence as well as statutory context. As noted in the Senate Judiciary Committee's *Statement to Senate Bill No. 257*, at 1 (Feb. 24, 1992), and mentioned above, *supra* at 84–85, 902 *A.*2d at 909–10, before the statute was passed [9] "sexual abuse victims [could only] bring suit against their abusers under legal theories of assault, battery, and intentional infliction of emotional distress." The statute permits a victim to sue his or her abuser specifically for sexual abuse and relaxes the time period within which the lawsuit can be filed by means of a liberal discovery rule provision. *Ibid.; see N.J.S.A.* 2A:61B–1b, c.

As also noted in the Senate Judiciary Committee's *Statement, supra*, at 2, when first introduced in the Legislature, Bill No. 257 limited the class of active abusers subject to suit to "person[s] who [have] custody or control over the child or [are] in a position of parental authority." Before the statute was enacted, however, the

---

[9] Bill No. 257 was subsequently enacted as the CSAA on September 24, 1992.

Legislature broadened the class by substituting "adult" for a "person who has custody or control." Thus, "an action can be maintained against *any* adult who sexually abuse[s] a child." *Ibid.* (emphasis added). Similarly, as introduced, Bill No. 257 allowed an action against passive abusers who were "person[s] in a position of parental authority." *Ibid.* As adopted, the CSAA provides that any "parent, foster parent, guardian or other person standing in loco parent[i]s" within the household also may be liable for sexual abuse if he or she knowingly permits the abuse. *Ibid.*

Both amendments to Bill No. 257 indicate a legislative intent to expand the classes of active and passive abusers subject to suit, which in turn suggests a broad interpretation of "parent, foster parent, guardian and other person." Further, that DYFS serves as a "guardian" of minor children undercuts the argument that only natural persons can be "persons" within the meaning of the CSAA. Consideration of Title I, *N.J.S.A.* 1:1–2, wherein entities such as the School are included in the definition of person, provides additional support for the conclusion that the School is a statutory "person."

We observe that the designation of a corporation as a person for certain purposes is not unusual. As Judge Payne pointed out in the principal opinion below, *Hardwicke, supra,* 368 *N.J.Super.* at 90, 845 *A.*2d 619, a corporation can only act through its officers, directors, agents, and servants. *See Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 *N.J.* 739, 761, 563 *A.*2d 31 (1989); *Schultz v. Roman Catholic Archdiocese,* 95 *N.J.* 530, 538, 472 *A.*2d 531 (1984). Thus, in a variety of contexts, our Court has held that a corporate entity has the obligations and the advantages of a person. For example, in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 615–27, 626 *A.*2d 445 (1993), the Court held that corporations may be responsible under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, for the discriminatory acts of an employee of the corporation. *See also Morton Bldgs., Inc. v. Rezultz, Inc.,* 127 *N.J.* 227, 235, 603 *A.*2d 946 (1992) (finding corporation has right to be present at trial and, therefore, "an officer or employee

of a corporation who is designated as the corporation's representative may not be sequestered"); *Gastman v. N. Jersey Newspapers*, 254 *N.J.Super.* 140, 145, 603 *A.2d* 111 (App.Div.1992) (holding corporate news organization qualified as fictitious "person" under New Jersey Shield Law (*N.J.S.A.* 2A:84A–21)); *State v. Lehigh Valley R.R. Co.*, 90 *N.J.L.* 372, 103 *A.* 685 (Sup.Ct.1917) (finding corporation can be held criminally liable for manslaughter). A finding that the School is potentially liable as a person under the CSAA is consonant with that case law.

Finally, a broad reading of the CSAA comports with the legislative goal to interpret remedial statutes liberally. *Young v. Schering Corp.*, 141 *N.J.* 16, 25, 660 *A.2d* 1153 (1995). In respect of child abuse in particular, the Legislature has enacted a number of civil and criminal statutes designed to protect children, apprehend abusers, and deter future abuse. *See, e.g., N.J.S.A.* 2C:7–1 to –18 (requiring registration and notification for released sex offenders); *N.J.S.A.* 9:6–8.10 (imposing duty on citizens to report suspected child abuse to DYFS); *N.J.S.A.* 9:6–8.36a (requiring Department of Human Services to report immediately all instances of suspected child abuse to county prosecutor); *N.J.S.A.* 9:6–8.75 (establishing New Jersey Task Force on Child Abuse and Neglect); *N.J.S.A.* 26:2H–12.6a (directing Department of Human Services to provide information on child abuse to all parents of newborns to prevent child abuse); *N.J.S.A.* 30:5B–25.3 (requiring DYFS to determine that there is no substantiated charge of child abuse against prospective or current child care provider or any household member); *N.J.S.A.* 36:2–30 (establishing Child Abuse Awareness Month); *see also J.S. v. R.T.H.*, 155 *N.J.* 330, 343, 344 n. 3, 714 *A.2d* 924 (1998) (noting State's policy to protect children and providing list of statutory enactments "deal[ing] extensively and comprehensively with the subject of protecting children from sexual abuse"). Those statutes tell us that a paramount goal of the Legislature is to keep children safe and to identify those who abuse them as well as those who facilitate the abuse.

In light of the language of the statute as supplemented by the definition of person in Title I, the extrinsic evidence of legislative intent, and the State's strong policy to hold both active and passive child abusers accountable, we find that the School is a person under the passive abuse provision of the CSAA.

**B.**

A question also has been raised whether the School stands *in loco parentis* to its students under the CSAA. We find that it does.

*In loco parentis* literally translated means "in the place of a parent." *Black's Law Dictionary* 803 (8th ed.2004). *Black's Law Dictionary* further describes the phrase as "relating to, or acting as a temporary guardian or caregiver of a child, taking on all or some of the responsibilities of a parent." *Ibid.* Typically, the *in loco parentis* relationship is temporary in nature, *Miller v. Miller*, 97 *N.J.* 154, 162, 478 *A.*2d 351 (1984) (quoting *A.S. v. B.S.*, 139 *N.J.Super.* 366, 369–70, 354 *A.*2d 100 (Ch.Div.1976), *aff'd*, 150 *N.J.Super.* 122, 374 *A.*2d 1259 (App.Div.1977)), and "is reserved for individuals who function as a parent." *Dale v. Boy Scouts of Am.*, 160 *N.J.* 562, 602, 734 *A.*2d 1196 (1999), *rev'd on other grounds*, 530 *U.S.* 640, 120 *S.Ct.* 2446, 147 *L.Ed.*2d 554 (2000). "Characteristics of that relationship include 'the responsibility to maintain, rear and educate the child,' as well as the duties of 'supervision, care and rehabilitation.' " *Ibid.* (citations omitted).

In this case, as Judge Payne held, by providing students with "necessary shelter, food, education, recreation, and succor," the School acted in place of their parents. *Hardwicke, supra,* 368 *N.J.Super.* at 87, 845 *A.*2d 619. By its "School Policies," the School regulated the students' personal hygiene, monitored the cleanliness of their rooms, dictated the amount of money each student could have on campus, required students to write two weekly letters to friends or family, expected students to attend religious services when on campus during the weekend, provided transportation for recreational activities off school grounds, and

disciplined students who violated those policies. Each student was assigned a faculty advisor by the School, who acted as a confidant to that student and was available at any time. In effect, the School accepted the responsibility to nurture these young children at a critical and vulnerable stage in their development.

Equally telling, the School has described itself as standing *in loco parentis* to its students in correspondence to parents, in school regulations, and in public statements. When he was Executive Director/Music Director, Hanson wrote to parents in March 1974 announcing an increase in fees for the 1974–75 year. In closing, Hanson remarked:

> The fact that *your son has been entrusted by you to us* is proof enough of your confidence in the school and devotion to the concept of learning that this school offers in its unique way.... Our mutual concern, and possible sacrifice, now is providing everyone's son with the foundation that will direct his entire life.
>
> [Emphasis added.]

The first section of the "Houseparent Handbook" for 2000–2001, entitled "In Loco Parentis," echoes that view. It states, "As substitute parents for these boys, we must always try to think of how their real parents might handle a particular situation and therefore exercise the best judgment possible." Indeed, School President John Ellis has said publicly that he "sits *in loco parentis* at this [S]chool and has care[d] for these children." Courts have similarly recognized the unique role that educators play in the care of students. *Cf. Frugis, supra,* 177 *N.J.* at 268, 827 *A.*2d 1040 (observing that "[w]hile their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards"); *see also Vernonia Sch. Dist. 47J v. Acton,* 515 *U.S.* 646, 654, 115 *S.Ct.* 2386, 2391, 132 *L.Ed.*2d 564, 575 (1995) (stating that "[w]hen parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them").

We conclude that the School's view of its role vis-à-vis its students is accurate and that there are more than sufficient indicia

of the exercise of parental authority to bring the School within the *in loco parentis* requirement of the CSAA.

## C.

Having determined that the School is a person standing *in loco parentis* to its boarding students, we now consider whether the School environment is a "household" under the CSAA. Forty-five years ago, in *Mazzilli v. Accident & Cas. Ins. Co.*, we stated that "[h]ousehold is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits." 35 *N.J.* 1, 8, 170 *A.*2d 800 (1961). Under New Jersey law, what the word "household" means depends on the circumstances of the case and has not been restricted to persons with familial relations. *Gibson v. Callaghan*, 158 *N.J.* 662, 672, 730 *A.*2d 1278 (1999); *Miller v. U.S. Fid. & Guar. Co.*, 127 *N.J.Super.* 37, 41, 316 *A.*2d 51 (App.Div.1974).

In *Resolution Trust Corp. v. Associated Gulf Contractors, Inc.*, 263 *N.J.Super.* 332, 342–43, 622 *A.*2d 1324 (App.Div.1993), *certif. denied*, 134 *N.J.* 480, 634 *A.*2d 527 (1993), the Appellate Division held that a housekeeper qualified as a household member for purposes of legal service of process. The court observed that in 1972, *Rule* 4:4–4 was amended to substitute "household" for "family member," thereby "eliminat[ing] questions as to the validity of service particularly where household units do not follow conventional family patterns." *Id.* at 343, 622 *A.*2d 1324 (quoting Pressler, *Current N.J. Court Rules*, comment 2 on *R.* 4:4–4 at 764 (1993)); *see also Borough of Glassboro v. Vallorosi*, 117 *N.J.* 421, 432–33, 568 *A.*2d 888 (1990) (finding ten unrelated male college students qualified as "family" for zoning purposes). Nor have our courts required "household" to include only those residing under the same roof. In *Storch v. Sauerhoff*, 334 *N.J.Super.* 226, 233–35, 757 *A.*2d 836 (Ch.Div.2000), the Chancery Division treated neighbors with financial and emotional ties as *de facto* household members in order to protect victims of domestic violence. The court observed that "a determination as to a party's status as a

'household member' must be based upon the qualities and characteristics of the particular relationship and not upon a mechanistic formula in a definition." *Id.* at 235, 757 *A.*2d 836 (citations omitted).

In this case, the School provides food, shelter, educational instruction, recreational activities and emotional support to its full-time boarders—in other words, housing with the amenities characteristic of both a school and a home. We find that "the qualities and characteristics of the [School-student] relationship," *ibid.*, establish the School as a household under the CSAA.

We conclude that the School is a "person" standing "*in loco parentis*" within a "household." Insofar as Hardwicke's complaint, Count I, alleges that the School knowingly permitted or acquiesced in the sexual abuse of Hardwicke by another person, the complaint presents a viable cause of action under the CSAA unless there is some other impediment to plaintiff's suit.

## III.

The School asserts that the CIA immunizes it from liability both for statutory claims under the CSAA and for other intentional torts. Plaintiff argues that intentional torts are not immunized and points to the plain language of the CIA, which refers only to immunity for "negligence."

The CIA states:

> No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside the benefactions of such corporation, society or association.
>
> [*N.J.S.A.* 2A:53A–7(a).]

We approach the task of statutory interpretation in respect of the CIA by applying the same rules we applied to determine the scope of the CSAA. As we explained in *O'Connell v. State,*

> "our overriding goal has consistently been the Legislature's intent." As a general rule, that process begins with an examination of the plain language of the statute. Where a statute is clear and unambiguous on its face and admits of only one interpretation, a court must infer the Legislature's intent from the statute's plain meaning.
>
> [171 *N.J.* 484, 488, 795 *A.*2d 857 (2002) (quoting *Young v. Schering Corp., supra,* 141 *N.J.* at 25, 660 *A.*2d 1153 (1995)) (citations omitted).]

By the plain meaning of *N.J.S.A.* 2A:53A–7(a), "an entity qualifies for charitable immunity when it '(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works.' " *O'Connell, supra,* 171 *N.J.* at 489, 795 *A.*2d 857 (quoting *Hamel v. State,* 321 *N.J.Super.* 67, 72, 728 *A.*2d 264 (App.Div.1999)). In relation to the parties' arguments, the statute explicitly states: "No nonprofit corporation, society or association ... shall ... be liable to respond in damages to any person who shall suffer damage from the *negligence* of any agent or servant of such corporation, society, or association...." *N.J.S.A.* 2A:53A–7(a) (emphasis added). In that the statute speaks only of immunity for "negligence," it would appear that " '[w]e need delve no deeper than the act's literal terms to divine the Legislature's intent.' " [10] *O'Connell, supra,* 171 *N.J.* at 488, 795 *A.*2d 857 (quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)).

---

[10] Our dissenting colleague ignores the plain meaning of the statute, specifically, that section 7(a) provides immunity for a nonprofit corporation only for "negligence" and not more egregious wrongful conduct. *Cf. DiProspero v. Penn,* 183 *N.J.* 477, 506–07, 874 *A.*2d 1039 (2005) (Rivera–Soto, J., concurring) (stating that the result in *DiProspero* is dictated by "the plain language of [the 1998 Automobile Insurance Cost Reduction Act], language that does not admit of an ambiguity and that does not require that the statutorily enumerated serious injuries for which recovery is available also must satisfy an unstated ... requirement").

When he dissented in *Schultz v. Roman Catholic Archdiocese,* Justice Handler described the boundaries of the "wrongful conduct" immunized by the CIA:

> An unstrained reading of the statutory language conveys the clear meaning that the wrongful conduct that is the focus of the statute consists of "negligence." There is not the slightest linguistic hint that . . . "negligence" . . . denotes anything other than ordinary negligence. *N.J.S.A.* 2A:53A–7 does not mention other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior. The statute by its evident terms does not address liability, or immunity from liability, for the commission of any torts other than simple negligence.
>
> [95 *N.J.* 530, 542–43, 472 *A.2d* 531 (1984) (Handler, J., dissenting).]

The School, however, contends the majority opinion in *Schultz* "suggested that institutional immunity under the CIA extended beyond mere negligence." That characterization misreads the Court's decision. In *Schultz,* parents sued the Archdiocese of Newark for negligent hiring after a parish school instructor sexually abused their son at summer camp and at the school; the son subsequently committed suicide. *Id.* at 532, 472 *A.2d* 531 (majority opinion). In affirming summary judgment for the Archdiocese, the Court, citing *Jones v. St. Mary's Roman Catholic Church,* 7 *N.J.* 533, 82 *A.2d* 187, *cert. denied,* 342 *U.S.* 886, 72 *S.Ct.* 175, 96 *L.Ed.* 664 (1951), determined that administrative negligence (negligent hiring) falls within the immunity for negligence found in the CIA. *Schultz, supra,* 95 *N.J.* at 534, 536–39, 472 *A.2d* 531.

At its core, the disagreement between the majority and the dissent was centered on the characterization of the tort at issue in the case—the intentional act of the instructor (the dissent) or the alleged negligent hiring by the Archdiocese (the majority). The majority's comments regarding immunity for intentional torts were, therefore, *dicta* and not necessary for the disposition of the case; as to other forms of wrongful conduct, the majority noted that "[w]hether immunity should cloak those with a reckless or gross disregard for the safety of others is a question that may have to be addressed" in the future. *Id.* at 539, 472 *A.2d* 531; *see also Monaghan v. Holy Trinity Church,* 275 *N.J.Super.* 594, 600,

646 *A*.2d 1130 (App.Div.1994) (recognizing that *Schultz* did not address whether CIA extended beyond negligence).

We adopt today the position of the dissent in *Schultz* and hold that the CIA immunizes simple negligence only, and not "other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior." [11] 95 *N.J.* at 542, 472 *A*.2d 531 (Handler, J., dissenting). We agree with Justice Handler that

> there is no reason to believe that this statutory meaning does not fully comport with the intent of the Legislature in enacting the statutory immunity. As noted, the legislative purpose was to overcome the judicial decisions that had abrogated the common law immunity. The statute was designed simply to reimplant the common law doctrine.
>
> [*Id.* at 543, 472 *A*.2d 531.]

In sum, when the Court abrogated the doctrine of charitable immunity in 1958, the Legislature responded by enacting the CIA. *Id.* at 541, 472 *A*.2d 531; *see Collopy v. Newark Eye and Ear Infirmary*, 27 *N.J.* 29, 141 *A*.2d 276 (1958) (abrogating common-law charitable immunity); *Dalton v. St. Luke's Catholic Church*, 27 *N.J.* 22, 141 *A*.2d 273 (1958) (clarifying that the *Collopy* abrogation applies to all charities); *Benton v. YMCA*, 27 *N.J.* 67, 141 *A*.2d 298 (1958) (explaining that ordinary rules of negligence and contributory negligence apply to charities). The statute

---

[11] Concerned about this Court's language in *Frugis, supra,* vis-à-vis a local Board of Education's responsibility toward the children in the care of the teachers and administrators hired by the Board, the principal opinion below relied, in part, on the doctrine of constitutional doubt in declaring the CIA inapplicable to actions brought under the CSAA. *Hardwicke v. Am. Boychoir Sch.,* 368 *N.J.Super.* 71, 91–97, 845 *A*.2d 619 (App.Div.2004). Because we find that the clear intendment of the CIA is to immunize nonprofit entities for negligence and not for intentional conduct, we do not invoke the doctrine in deciding the issue.

Moreover, in discussing the CIA, Judge Payne treated common-law claims separately from claims brought under the CSAA. *Id.* at 91, 97, 845 *A*.2d 619. Our holding in respect of the limits of immunity under the CIA applies both to the CSAA and plaintiff's common-law claims grounded in reckless and/or intentional conduct.

reinstated the common law as it had developed prior to the Court's abolition of the doctrine in 1958.

Thus, although *N.J.S.A.* 2A:53A–10 states that the CIA "shall be liberally construed," we must consider the scope of that common law when interpreting the scope of the immunities provided in the statute. Our research discloses no case in this State prior to the enactment of the CIA that, under the common law, relieved a charity from liability for any tort but negligence. Moreover, we have found no other jurisdiction that provides charitable immunity for intentional torts or willful and wanton conduct. We are confident that if charitable immunity for intentional torts exists at all, it is rare, and that it does not exist under the CIA.

We add only the following. In 1995, the Legislature amended *N.J.S.A.* 2A:53A–7(a) and –7(c). *L.* 1995, *c.* 183, § 1. Under section 7(a), the list of immune institutional entities ("non-profit corporation[s], societ[ies] or association[s]") was expanded to include individuals (the "trustees, directors, officers, employees, agents, servants or volunteers" at those entities), whereas under section 7(c), the immunity available to those individuals was specifically limited:

Nothing in this section shall be deemed to grant immunity to: (1) any trustee, director, officer, employee, agent, servant or volunteer causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature; (2) any trustee, director, officer, employee, agent, servant or volunteer causing damage as the result of the negligent operation of a motor vehicle; or (3) an independent contractor of a nonprofit corporation, society or association organized exclusively for religious, charitable or educational or hospital purposes.

[*N.J.S.A.* 2A:53A–7(c).]

The issue presented by the 1995 amendments is framed by Judge Stern in his concurrence below, in which he states that "[i]f the [entity] immunity provided for in the CIA covered only negligence, there would be no need for the exception for willful and wanton misconduct [of individuals]" in the 1995 amendments. *Hardwicke, supra,* 368 *N.J.Super.* at 108, 845 *A.*2d 619 (Stern, J., concurring). We decline to read the amendments as a gloss on

the word "negligence" in the context of entity immunity. Because in amending the statute the Legislature explicitly excluded the "willful, wanton or grossly negligent act[s]" of individuals, that does not mean that immunity for such conduct must be read into "negligence."

Further, in 2006, the CIA was again amended by the enactment of *N.J.S.A.* 2A:53A–7.4. The 2006 amendment eliminates the immunity of statutory entities in respect of "a claim in any civil action that the negligent hiring, supervision or retention of any employee, agent or servant resulted in a sexual offense being committed against a person under the age of 18 who was a beneficiary of the nonprofit organization." We agree with plaintiff that it would be anomalous indeed for the Legislature to have provided a cause of action for negligent hiring, supervision or retention against a nonprofit entity unless the Legislature believed that suits claiming other forms of wrongful conduct by those entities were already permitted. The 2006 amendment, by allowing an action for negligence, strongly suggests that the Legislature intended to eliminate, in the context of "hiring, supervision or retention," the one immunity the CIA provided—the immunity for negligence.

Consistent with the plain meaning of the CIA, we hold that the CIA immunizes charitable entities for negligence only, and that under the 2006 amendment plaintiff has a claim for negligent hiring, supervision and retention against the School.

## IV.

We have determined that plaintiff has stated a statutory cause of action against the School for sexual abuse under the CSAA and that he is not barred by the CIA from pursuing claims for willful, wanton or grossly negligent conduct. Plaintiff can pursue his statutory cause of action *and* any common-law claims he may have that are based on willful, wanton or grossly negligent conduct, and/or negligent hiring, supervision and retention. The School argues, however, that the relaxed discovery rule provisions

of the CSAA are not available to plaintiff in respect of his common-law claims and that, in any case, the law of agency prevents holding the School liable for acts of its employees outside the scope of their employment.

*N.J.S.A.* 2A:61B–1b states, in part, that "[i]n any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." By its literal terms, section 1b applies to "any civil action ... based on sexual abuse" ("sexual abuse" is separately defined in section a(1) of the statute). As Judge Payne points out, "[t]he statute does not state: in 'any civil action for injury or illness *arising under this Act.*' " *Hardwicke, supra,* 368 *N.J.Super.* at 106, 845 *A.*2d 619 (emphasis added). Without that restriction, a plain reading of the statutory language indicates that "any civil action" includes any common-law claims based on conduct that falls within the definition of sexual abuse, and that such claims may be brought under the liberal tolling provision associated with the two-year statute of limitations in the CSAA.[12] In that Hardwicke alleges common-law claims based on sexual abuse as defined in *N.J.S.A.* 2A:61B–1a(1)(2) and (3), the CSAA tolling provision is available to him if he is able to prove the facts necessary for its application. On remand, after a hearing, the trial court must determine whether the two-year statute of limitations is tolled as to Hardwicke. *See N.J.S.A.* 2A:61B–1b (requiring actions to be brought within two years of reasonable discovery) and *N.J.S.A.* 2A:61B–1c (explaining grounds for equitable tolling).

The School asserts, also, that plaintiff's common-law claims against it must fail because the School cannot be held vicariously liable for the intentional acts of its employees. Plain-

---

[12] To the extent that the principal opinion below may suggest the liberal tolling provisions of the statute apply to common-law causes of action based on conduct not within the definition of sexual abuse found in the CSAA, 368 *N.J.Super.* at 105–06, 845 *A.*2d 619, we disagree.

tiff, relying on section 219 of the *Restatement (Second) of Agency* (1958), and *Lehmann, supra,* 132 *N.J.* at 587, 626 *A.*2d 445, responds that modern principles of agency law permit his vicarious liability claims. Under section 219 of the *Restatement,* an employer is not liable for the torts of an employee acting outside the scope of the employment unless "the conduct violated a non-delegable duty of the [employer], or . . . the [employee] purported to act . . . on behalf of the [employer] and there was reliance upon apparent authority, or [the employee] was aided in accomplishing the tort by the existence of the agency relation." *Restatement, supra,* § 219(2)(c) to (d);[13] *see Lehmann, supra,* 132 *N.J.* at 619–20, 622–23, 626 *A.*2d 445.

In *Lehmann,* we adopted section 219 as the framework for evaluating employer liability in hostile environment sexual harassment claims brought under LAD. *Id.* at 619–20, 626 *A.*2d 445. We explained that an employer could be held vicariously liable under section 2(d) even when the employee was acting outside the scope of his or her employment "if an employer [had] delegate[d] the authority to control the work environment to a supervisor and [the] supervisor abuse[d] [the] delegated authority." *Id.* at 620, 626 *A.*2d 445 (citations omitted). That inquiry, we stated, requires the fact-finder to determine that: (1) the employer gave the authority to the supervisor to control the situation about which the plaintiff complains; (2) the supervisor exercised that authority; (3) the exercise of authority resulted in a violation of the LAD; and

---

[13] Section 219, in its entirety, states:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

    (a) the master intended the conduct or the consequences, or

    (b) the master was negligent or reckless, or

    (c) the conduct violated a non-delegable duty of the master, or

    (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

(4) the authority delegated by the employer to the supervisor aided the supervisor in injuring the plaintiff. *Ibid.*

A year later, the Court extended its holding in *Lehmann* to claims brought under the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 417, 650 *A.*2d 958 (1994). We reasoned that

> [b]oth CEPA and LAD effectuate important public policies. Each seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers. In both contexts, employers are best situated to avoid or eliminate impermissible vindictive employment practices, to implement corrective measures, and to adopt and enforce employment policies that will serve to achieve the salutary purposes of the respective legislative mandates.
>
> [*Id.* at 418, 650 *A.*2d 958.]

The considerations that informed our analyses in *Lehmann* and *Abbamont* apply equally to claims predicated on facts indicating child abuse. As stated earlier, *supra* at 90–91, 902 *A.*2d at 913, the CSAA recognizes the vulnerability of children and demonstrates a legislative intent to protect them from victimization. In our view, common-law claims based on child abuse are supported by the same compelling rationale. The CSAA imposes responsibility on those in the best position to know of the abuse and stop it; application of section 219 of the *Restatement* to plaintiff's common-law claims advances those goals.

One issue remains. Judge Payne determined that, under the common-law, the School could be liable for Hanson's sexual abuse of Hardwicke during the summer of 1971. *Hardwicke, supra,* 368 *N.J.Super.* at 102–05, 845 *A.*2d 619. She explained that the CIA did not bar Hardwicke's claims for intentional conduct, and that agency principles could provide the basis for *respondeat superior* liability. We agree with Judge Payne's disposition of this issue, which should be decided on remand. We express no opinion as to whether plaintiff was a beneficiary of the School that summer; that question also must be resolved on remand.

## V.

The judgment of the Appellate Division, as modified, is affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

In this appeal, the majority reaches five separate substantive conclusions. These are:

(1) that "[i]n light of the language of the statute as supplemented by the definition of person in Title I [of the Child Sexual Abuse Act (CSAA), *N.J.S.A.* 2A:61B–1], the extrinsic evidence of legislative intent, and the State's strong policy to hold both active and passive child abusers accountable, we find that the [American Boychoir] School is a person under the passive abuse provision of the CSAA[,]" *ante,* 188 *N.J.* at 91, 902 *A.*2d at 113 (2006);

(2) that "the School's view of its role vis-à-vis its students is accurate and that there are more than sufficient indicia of the exercise of parental authority to bring the School within the *in loco parentis* requirement of the CSAA[,]" *ante,* 188 *N.J.* at 92–93, 902 *A.*2d at 914 (2006);

(3) that "the qualities and characteristics of the [School-student] relationship establish the School as a household under the CSAA[,]" *ante,* 188 *N.J.* at 94, 902 *A.*2d at 915 (2006) (citation and internal quotation marks omitted);

(4) that "the [Charitable Immunity Act] immunizes charitable entities for negligence only, and that under the 2006 amendment plaintiff has a claim for negligent hiring, supervision and retention against the School[,]" *ante,* 188 *N.J.* at 99, 902 *A.*2d at 918 (2006); and,

(5) that "any common-law claims based on conduct that falls within the definition of sexual abuse ... may be brought under the liberal tolling provision associated with the two-year statute of limitations in the CSAA[,]" *ante,* 188 *N.J.* at 100, 902 *A.*2d at 919 (2006) (footnote omitted).

Save for the majority's conclusion that plaintiff's intentional tort claims are not barred by statutory charitable immunity, I concur with the majority. In respect of the majority's conclusion that charitable immunity applies only to negligence claims, I respectfully dissent. Further, I also address whether plaintiff's claims are time-barred.

### I.

Plaintiff's amended complaint alleged seven separate causes of action.[1] They consisted of a single statutory claim of sexual assault under the CSAA seeking compensatory and punitive damages based on violation of the CSAA, *N.J.S.A.* 2A:61B–1, and the common-law torts of intentional infliction of emotional distress; negligent infliction of emotional distress; negligent and/or fraudulent non-disclosure;[2] assault and battery; negligent hiring and supervision; and false imprisonment. One must start, then, with an analysis of whether plaintiff's claims are barred by statutory charitable immunity.

### II.

Although charitable immunity long has been part of New Jersey's common law legal landscape, *D'Amato v. Orange Mem'l Hosp.*, 101 *N.J.L.* 61, 127 *A.* 340 (E. & A.1925), there has been significant tension between the Legislature and this Court concerning the doctrine's continued viability. In a trilogy of cases, this Court abolished charitable immunity as a judicially created doctrine. *Benton v. Y.M.C.A.*, 27 *N.J.* 67, 69, 141 *A.*2d 298 (1958); *Collopy v. Newark Eye & Ear Infirmary*, 27 *N.J.* 29, 39, 141 *A.*2d 276 (1958); *Dalton v. St. Luke's Catholic Church*, 27 *N.J.* 22, 24, 141 *A.*2d 273 (1958). What followed next was succinctly described in *Schultz v. Roman Catholic Archdiocese of Newark*, 95 *N.J.* 530, 536–37, 472 *A.*2d 531 (1984):

> Within a week, the Legislature acted to restore the doctrine by introduction of an act to provide immunity for all nonprofit corporations organized for religious,

---

[1] There was an additional claim for loss of consortium pressed by plaintiff's wife. As the majority notes, that claim was dismissed by the trial court and no appeal was taken from that determination. *Ante,* 188 *N.J.* at 81, 902 *A.*2d at 907 (2006) (n. 5 and accompanying text).

[2] The School did not seek summary judgment on the basis that plaintiff's claim for negligent and/or fraudulent disclosure was time-barred. Therefore, no opinion is expressed whether that claim is barred by either the now statutorily-codified charitable immunity doctrine or the statute of limitations.

charitable, educational, or hospital purposes from negligence suits brought by any person who was a beneficiary, to whatever degree, of the organization's works. . . . It remains the law today. The Legislature thus quickly reversed the retreat of the doctrine in New Jersey.

The Legislature's response was the Charitable Immunity Act, *N.J.S.A.* 2A:53A–7 to –11(CIA). The relevant portion of that statute currently provides that:

No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

[*L.* 1959, *c.* 90, § 1, *as amended by L.* 1995, *c.* 183, § 1, *codified at N.J.S.A.* 2A:53A–7a.]

As we recently noted, the application of that statute is straightforward: "an entity qualifies for charitable immunity when it (1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *O'Connell v. State,* 171 *N.J.* 484, 489, 795 *A.*2d 857 (2002) (citations and internal quotation marks omitted).

If we faithfully apply the *O'Connell* test, the conclusion that the CIA applies with full force here is unassailable. There can be no doubt that the School was "formed for nonprofit purposes[.]" Further, it is beyond question that the School was "organized exclusively for . . . educational purposes[.]" Finally, no one can dispute that the School was "promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works."

Rejecting that approach, the majority adopts instead the position advanced in dissent in *Schultz v. Roman Catholic Archdiocese of Newark, supra,* 95 *N.J.* at 540, 472 *A.*2d 531 (Handler, J.,

dissenting). In doing so, the majority does not address *Schultz's* well-reasoned rejection of the position the majority embraces:

> Our dissenting colleagues advance a related theory. The argument has attraction because our natural sympathies favor the result, but it presents problems of consistency. It suggests that immunity is lost when the tort is intentional, since the statutory immunity refers consistently and exclusively to "negligence." Thus the fact that the ultimate act that did the damage was intentional takes the entire incident out of the statute in the dissent's view. That would make the church, protected in the past by the common law immunity and now by statutory immunity, more vulnerable than private entities protected by neither common law nor statutory immunity. The dissent asks us to assume that the Legislature decided to disregard all other aspects of the tort and simply focus on the final action. Its premise is that the Legislature, having removed liability for the most likely situations, implicitly would restore liability for the most unlikely situations. Would not the same logic also apply had the sexual crime been committed by an unsupervised fellow student. Yet in *Jones* [*v. St Mary's Roman Catholic Church*, 7 *N.J.* 533, 538, 82 *A.*2d 187 (1951)], the negligent failure to avert the commission of an intentional act by a fellow student did not impose liability.
>
> At root is the dissent's notion that the church should be liable when its employees are not pursuing the business of charity: "It is evident that in the commission of an intentional tort, the wrongful conduct is so far removed from the beneficent purposes of the charity that it would serve no salutary societal goal to accord immunity from liability. The immunity protects the charity in its normal endeavors, and not in activities that are antithetical to its charitable ends." [95 *N.J.*] at 549 [472 *A.*2d 531]. It is ironic that in the dissent's view the more remote the agent's act is from the charity's purposes, the more liable the charity will become. This is contrary to common law doctrine.
>
> [*Schultz v. Roman Catholic Archdiocese of Newark, supra*, 95 *N.J.* at 535–36, 472 *A.*2d 531 (footnote omitted).]

There is no reason to depart from *Schultz's* powerful logic. For the reasons the *Schultz* majority so easily rejected its dissent's contentions, so too I reject the majority's conclusions here.

That conclusion is further buttressed by the 1995 amendments to the CIA, which cannot be read as anything other than the Legislature's intent not only to retain charitable immunity, but to expand it. Originally, the CIA's scope reached those entities organized for "religious, charitable, educational or hospital purposes[.]" *L.* 1959, *c.* 90, § 1. The 1995 amendments, however, deleted hospitals from that list in the explicit recognition that only *nonprofit* hospitals should receive the benefit of the doctrine, thereby barring for-profit hospitals from its reach. *N.J.S.A.*

2A:53A–7b.[3]  Furthermore, the 1995 amendments increased the breadth of the CIA's reach by adding all "trustees, directors, officers, employees, agents, servants or volunteers" of a qualifying nonprofit to the scope of those protected by the charitable immunity doctrine.  *L.* 1995, *c.* 183, § 1.

Most important, however, are the explicit limitations the 1995 amendments placed on the scope of immunity of those whom those amendments added to the list of immunized persons: "Nothing in this section shall be deemed to grant immunity to: (1) any trustee, director, officer, employee, agent, servant or volunteer causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature[.]"  *N.J.S.A.* 2A:53A–7c(1).  Thus, the Legislature included within the ambit of those eligible for charitable immunity these specific individuals—trustees, directors, officers, employees, agents, servants or volunteers—while contemporaneously limiting the scope of the immunity granted to them.  This construction can only mean that *solely those specifically enumerated persons* would not be immunized for "a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature[.]"  Significantly, the Legislature did not similarly limit the immunity granted to nonprofit institutions that were the objects of the charitable immunity doctrine in the first instance.  Thus, the result the majority reaches today contravenes the Legislature's clear actions:  although the Legislature could

---

[3] The application of charitable immunity in respect of non-profit hospitals is further limited by *N.J.S.A.* 2A:53A–8, which provides that "[n]otwithstanding the provisions of the [Charitable Immunity Act, nonprofit hospitals] shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of [the nonprofit hospital] or of its agents or servants to an amount not exceeding $250,000 ... and to the extent to which such damage ... shall exceed the sum of $250,000 such [non-profit hospital] shall not be liable therefor."  *See also White v. Mattera,* 175 *N.J.* 158, 163, 814 *A.*2d 627 (2003) (explaining legislative abrogation of total immunity for nonprofit hospitals while imposing liability limits).

have limited the scope of charitable immunity as applied to nonprofit institutions in the same way that it did so in respect of individuals, it refused to do so.

On the whole, then, the language, history and core logic of the CIA inescapably leads to the conclusion that the limitation sought by the majority and earlier rejected in *Schultz*—that the CIA applies only in respect of negligence and does not reach intentional torts—is not well-founded.[4] I therefore reject the majority's conclusions in respect of the application of the CIA to the claims

---

[4] The majority asserts that I "ignore[ ] the plain meaning of the statute, specifically, that section 7(a) provides immunity for a nonprofit corporation only for 'negligence' and not more egregious wrongful conduct." *Ante*, 188 *N.J.* at 95 n. 10, 902 *A.2d* at 916 n.10 (2006). However, the time for such interpretive luxury is long past.

More than twenty-two years ago, *Schultz* considered and rejected the analysis today adopted by the majority, ironically also on the basis of a plain language analysis. Because *Schultz* already interpreted the CIA to include both negligent *and* intentional torts, the correct course is to refrain from engaging anew in an examination of the statute's plain language. Instead, as this Court has repeatedly held, the principled analysis is that the Legislature's failure to statutorily change *Schultz's* result demonstrates the Legislature's acquiescence with *Schultz's* reasoning and conclusions. *Macedo v. Dello Russo*, 178 *N.J.* 340, 346, 840 *A.2d* 238 (2004); *Quaremba v. Allan*, 67 *N.J.* 1, 14, 334 *A.2d* 321 (1975). *See also Tlumac v. High Bridge Stone*, 187 *N.J.* 567, 573, 902 *A.2d* 222 (2006) (citations omitted) (holding that "[w]hen interpreting a statute, the Court's role is to effectuate the will of the Legislature[,]" and determining that result is achieved when it is "[c]onsistent with the long-standing interpretation that court's have given to [the statute] and the legislative acquiescence in that interpretation[.]"); *State v. Chapland*, 187 *N.J.* 275, 291, 901 *A.2d* 351 (2006) (citations omitted) (holding that "the Legislature is presumed to be aware of the judicial construction placed on an enactment [and that, i]n this case, that construction is supported by a long period of legislative acquiescence or failure to amend the statute indicating agreement with the Court's holdings."); *Tonelli v. Bd. of Educ. Of Twp. of Wyckoff*, 185 *N.J.* 438, 448, 888 *A.2d* 433 (2005) (same); *Smith v. Fireworks by Girone, Inc.*, 180 *N.J.* 199, 215, 850 *A.2d* 456 (2004) (same); *Green v. Jersey City Bd. of Educ.*, 177 *N.J.* 434, 445, 828 *A.2d* 883 (2003) (same). The controlling authority is clear: "There is ample precedent in New Jersey to support the proposition that, when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute." *Cavuoti v. N.J. Transit Corp.*, 161 *N.J.* 107, 133–34, 735 *A.2d* 548 (1999) (*per curiam*) (citing cases).

pressed here. I turn, then, to whether plaintiff's statutory and common-law claims are barred by the statute of limitations.

## III.

### A.

We have explained that "[t]he statute of limitations governs the period during which a party may bring a suit, and generally accrues from the date of the negligent act or omission." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.,* 163 *N.J.* 45, 51, 747 *A.*2d 266 (2000) (citing *Tortorello v. Reinfeld,* 6 *N.J.* 58, 65, 77 *A.*2d 240 (1950)). We further have explained that "[t]he purpose of a limitations period, which embodies important public policy considerations, is to stimulate activity, punish negligence, and 'promote repose by giving security and stability to human affairs.' " *Ibid.* (quoting *Wood v. Carpenter,* 101 *U.S.* 135, 139, 25 *L.Ed.* 807 (1879)). We have cautioned, however, that "[t]o prevent the sometimes harsh result of a mechanical application of the statute of limitations, we adopted the discovery rule." *Id.* at 52, 747 *A.*2d 266 (citing *Vispisiano v. Ashland Chem. Co.,* 107 *N.J.* 416, 426, 527 *A.*2d 66 (1987); *Fernandi v. Strully,* 35 *N.J.* 434, 449–50, 173 *A.*2d 277 (1961)). We have stressed that "[t]he discovery rule is essentially a rule of equity [and that it] provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Ibid.* (quoting *Lopez v. Swyer,* 62 *N.J.* 267, 272–73, 300 *A.*2d 563 (1973) (internal quotation marks omitted)).

Quoting *Baird v. American Med. Optics,* 155 *N.J.* 54, 66, 713 *A.*2d 1019 (1998), *Martinez* highlighted that

[c]ritical to the running of the statute is the injured party's awareness of the injury and the fault of another. The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another. (citations omitted)

[*Martinez v. Cooper Hosp.-Univ. Med. Ctr., supra,* 163 *N.J.* at 52, 747 *A.*2d 266.]

*Martinez* further noted that "[t]he question is whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another[,]" and concluded that "[t]he standard is basically an objective one— whether plaintiff 'knew or should have known' of sufficient facts to start the statute of limitations running." *Ibid.* (citing *Baird v. American Med. Optics, supra,* 155 *N.J.* at 72, 713 *A.*2d 1019). Finally, *Martinez* explained the application of that analysis as follows:

> That does not mean that a plaintiff must have knowledge of a specific basis for legal liability or a provable cause of action before the statute of limitations begins to run. *Savage v. Old Bridge–Sayreville Med. Group,* 134 N.J. 241, 248 [633 A.2d 514] (1993). It does, however, require knowledge not only of the injury but also that another is at fault. *Id.* at 246 [633 A.2d 514]; *Lynch v. Rubacky,* 85 *N.J.* 65, 70 [424 *A.*2d 1169] (1981). Both are critical elements in determining whether the discovery rule applies.

> For that analysis, plaintiffs are divided into two classes: those who do not know that they have been injured and those who know they have suffered an injury but do not know that it is attributable to the fault of another. *Lopez, supra,* 62 *N.J.* at 274 [300 *A.*2d 563]. A cause of action does not accrue until both of those factors exist.

> In many cases, knowledge of fault is acquired simultaneously with knowledge of injury.... In other cases, however, a plaintiff may be aware of an injury, but not aware that the injury is attributable to the fault of another.

> [*Id.* at 52–53, 747 *A.*2d 266.]

Any fair application of those standards to the limited facts presented here leads to but one conclusion: plaintiff's statutory and common-law claims are likely time-barred. The events complained of by plaintiff occurred between October 1970 and April 1971, when plaintiff was approximately thirteen years old. For limitations purposes, then, plaintiff would have been considered a minor and, hence, the relevant limitations period [5] would have been tolled until plaintiff achieved "the age of 21 years." *N.J.S.A.*

---

[5] Because each of the common-law torts complained of by plaintiff allege "the wrongful act, neglect or default of any person within this State[, an action alleging such torts was required to] be commenced within 2 years next after the cause of action of any such action shall have accrued[.]" *N.J.S.A.* 2A:14–2a.

2A:14-21. Plaintiff, however, did not bring this action until more than thirty-one years after he first entered the School, more than thirty years after plaintiff alleges the sexual assaults he endured started, almost thirty years after plaintiff alleges the sexual assaults ended, and at least twenty-two years after plaintiff reached the age of majority. At first blush, then, plaintiff's statutory and common-law claims should be time-barred.

## B.

Eschewing that analysis, the Appellate Division concluded that the tolling provision of the CSAA, *N.J.S.A.* 2A:61B-1b, tolls both plaintiff's statutory and common-law claims. Although it provides for a two-year statute of limitations from the accrual of the cause of action, *N.J.S.A.* 2A:61B-1b also provides that, "[i]n any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." According to the Appellate Division, because "[t]he statute does not state ... in 'any civil action for injury or illness arising under this Act[,]' " the panel "interpret[ed] the relaxed statute of limitations to apply to all remaining counts of plaintiff's complaint, not only those brought under the [CSAA]." *Hardwicke v. Am. Boychoir Sch.*, 368 *N.J.Super.* 71, 106, 845 *A.*2d 619 (App.Div.2004). The majority rejects the breadth of the panel's reasoning. To the extent the majority tethers the application of the CSAA's tolling provision to "common-law claims based on sexual abuse as defined in [the CSAA,]" *ante,* 188 *N.J.* at 100, 902 *A.*2d at 919 (2006), I concur. That said, I add the following.

The precise terms of *N.J.S.A.* 2A:61B-1b govern. That statute clearly states that "any civil action for injury or illness based on sexual abuse" will be entitled to its tolling provision. "Sexual abuse" is a defined term within the CSAA, one that requires an "act of sexual contact or sexual penetration between a child under the age of 18 years and an adult." *N.J.S.A.* 2A:61B-1a(1). In turn, both "sexual contact" and "sexual penetration" are statutori-

ly defined. *N.J.S.A.* 2A:61B–1a(2) and (3). When read in the context of those definitions, it is clear that the Legislature did not intend to extend the CSAA's tolling provisions to every conceivable common-law tort having a common nucleus of fact with an act of sexual abuse. The Legislature's reach was much shorter: it sought to "establish a statutory civil action for sexual abuse" and, "[b]ecause of the unique nature of sexual abuse, which may only be discovered by an adult victim after years of repression, [it] provide[d] that a civil suit for sexual abuse shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." *Senate Judiciary Committee Statement,* Senate Bill No. 257—*L.* 1992, *c.* 109.

According to the Appellate Division's reasoning, any cause of action related to an act of sexual abuse—whether statutorily based on the CSAA or grounded in the common law—is entitled to the CSAA's tolling provisions. The better view is, if the Legislature had intended that the CSAA tolling provision extend past the CSAA itself, it would have said that the CSAA's tolling provision applied "[i]n any *statutory or common law* civil action for injury or illness based on sexual abuse. . . ." That the Legislature did not do.

On the contrary, during the pendency of this appeal, the Legislature adopted an exception to the Charitable Immunity Act to provide that statutory charitable immunity "shall not apply to a claim in any civil action that the negligent hiring, supervision or retention of any employee, agent or servant resulted in a sexual offense being committed against a person under the age of 18 who was a beneficiary of the nonprofit organization." *N.J.S.A.* 2A:53A–7.4 (effective Jan. 5, 2006). When it did so, however, the Legislature limited this exception:

> The provisions of [*N.J.S.A.* 2A:53A–7.4] shall apply prospectively and also shall be applicable to all civil actions for which the statute of limitations has not expired as of [January 5, 2006], including the statutes of limitation set forth in [the Child Sexual Abuse Act, N.J.S.A. 2A:61B–1]. These applicable actions include but are not limited to matters filed with a court that have not yet been dismissed or finally adjudicated as of [January 5, 2006].

[*N.J.S.A.* 2A:53A–7.5.]

Thus, when squarely confronted with the opportunity to adopt a broad rule, the Legislature refused to do so, electing instead to adopt a measured approach that preserves those actions not yet stale while jettisoning time-barred actions.

In light of the strong policy considerations that undergird the application of statutes of limitations, and in the face of intervening legislative action, the reach of the CSAA's tolling provision cannot be extended beyond those actions that fit the statutory definition of "sexual abuse."

## C.

No matter how one parses the application of the CSAA's tolling provision, plaintiff's claims, whether statutory or common-law, are not entirely free of statute of limitations concerns. The CSAA's tolling provisions describe that "the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." *N.J.S.A.* 2A:61B–1b. In this context, "where, within the limitations period, a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty to act." *Martinez v. Cooper Hosp.- Univ. Med. Ctr., supra,* 163 *N.J.* at 55, 747 *A.*2d 266. *Martinez* also explains that "where a plaintiff knows of an injury, but fault is not self-evident or implicit in the injury itself, it must be shown that a reasonable person would have been aware of such fault in order to bar the plaintiff from invoking the discovery rule." *Ibid.* We look to the plaintiff because, although "a plaintiff's subjective characteristics, standing alone, will not absolve him or her of the obligation to file a claim within the relevant statutory period[,] . . . a litigant's personal characteristics may be relevant to an objective fact in issue." *Ibid.*

The starting point is that "whenever a plaintiff claims a right to relief from the bar of the statute of limitations by virtue of the so-called 'discovery' rule, the question as to whether such relief is properly available shall be deemed an issue for determination by

the court rather than by the jury." *Lopez v. Swyer,* 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973). The procedure to be followed is clear:

The determination by the judge should ordinarily be made at a preliminary hearing and out of the presence of the jury. Generally the issue will not be resolved on affidavits or depositions since demeanor may be an important factor where credibility is significant. Where credibility is not involved, affidavits, with or without depositions, may suffice; it is for the trial judge to decide. The issue will be whether or not a party, either plaintiff or counterclaimant, is equitably entitled to the benefit of the discovery rule. All relevant facts and circumstances should be considered. The determinative factors may include but need not be limited to: the nature of the alleged injury, the availability of witnesses and written evidence, the length of time that has elapsed since the alleged wrongdoing, whether the delay has been to any extent deliberate or intentional, whether the delay may be said to have peculiarly or unusually prejudiced the defendant.

[*Id.* at 275–76, 300 *A.*2d 563 (footnote omitted).]

At that hearing, plaintiff, the party who seeks to avoid the application of the statute of limitations, bears the burden of proof and persuasion. *Id.* at 276, 300 *A.*2d 563 ("The burden of proof will rest upon the party claiming the indulgence of the rule.") (footnote omitted).

Plaintiff's complaint alleged that, as a result of the repeated sexual abuse he endured while at the School, "throughout the remainder of his childhood and through most of his adult life, [plaintiff] believed that he was a homosexual and struggled with his conflict over his sexual identity." However, plaintiff also alleged that "[a]lthough [he] had a conscious memory of the acts of sexual abuse ... perpetrated upon him by defendants, he was not aware that the serious psychological and mental illness suffered by him was caused by these acts of abuse until, at the earliest, the Fall of 1999, with the assistance of psycho-therapy and counseling." Against that backdrop and given the credibility issues inherent in those contradictory allegations, this case is a textbook example of the cases that must survive the crucible of *Lopez* in order to trigger the tolling of the statute of limitations. Thus, even if all of plaintiff's claims are eligible for the tolling provisions of *N.J.S.A.* 2A:61B–1b, nothing in the majority's opinion should be read to excuse plaintiff from the requirement that every one of his

claims, both statutory and common-law, must survive a *Lopez* hearing and determination.[6]

### D.

In the final analysis, the *Lopez* hearing that must follow the remand ordered by the majority may render unnecessary any distinction between plaintiff's statutory and common-law claims. Because they share a common factual basis, whether plaintiff's claims are time-barred appears to be an all-or-nothing proposition: if any one claim is time-barred, they all must be time-barred.

Further, even if plaintiff is allowed to proceed to trial and he succeeds on all of his claims, he nonetheless will be entitled to only a single recovery. *Alfone v. Sarno,* 87 *N.J.* 99, 115, 432 *A.*2d 857 (1981) ("A requirement that a tortfeasor pay twice for the same damages caused by a single wrong would be inconsistent with basic principles of tort law."); *Theobald v. Angelos,* 44 *N.J.* 228, 239, 208 *A.*2d 129 (1965) ("[T]here may be but one satisfaction of a wrong."). *See also Neveroski v. Blair,* 141 *N.J.Super.* 365, 382, 358 *A.*2d 473 (App.Div.1976) (providing single recovery from aggregate of deceptive practices claim under Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –135, fraudulent concealment, and breach of contract claims, particularly where additional Consumer Fraud Act remedies of treble damages and counsel fees were awarded), *superseded by statute on other grounds, N.J.S.A.* 56:8–19; *Concrete Spaces, Inc. v. Sender,* 2 *S.W.*3d 901, 909–11 (Tenn.1999) (explaining difficulties that arise when plaintiff seeks relief under multiple theories of recovery); *Dowd & Dowd, Ltd. v. Gleason,* 181 *Ill.*2d 460, 486, 230 *Ill.Dec.* 229, 693 *N.E.*2d 358, 371–72 (Ill.1998) ("A plaintiff may plead and prove multiple causes of action, though it may obtain only one recovery for an injury.") (citations omitted). In this case, the admissibility of relevant

---

[6] Without referencing *Lopez* itself, the majority explicitly commands a *Lopez* hearing on remand. *Ante,* 188 *N.J.* at 100, 902 *A.*2d at 919 (2006) ("On remand, after a hearing, the trial court must determine whether the two-year statute of limitations is tolled as to Hardwicke.").

evidence does not hinge on whether any one of plaintiff's claims survives. Moreover, if successful, plaintiff will be made whole on his CSAA claim alone.[7] In those circumstances, the balance of equities required to toll a limitations period leads to the following result: the continuation of plaintiff's common-law claims does nothing to benefit plaintiff while it injects an unnecessary element of prejudice to defendants.

### IV.

I concur with the lion's share of the majority's views: that the School is a "person" under the passive abuse provision of the CSAA; that the School falls within the *in loco parentis* requirement of the CSAA; that the School is a "household" under the CSAA; and that whether plaintiff's claims are time-barred remains to be adjudicated. To the extent, however, that the majority concludes that statutory charitable immunity does not bar plaintiff's claims for relief in this case, I respectfully dissent.

*For affirmance as Modified/Remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI and WALLACE—5.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.

---

[7] The breadth of damages recoverable under the CSAA alone moots any concern that a successful CSAA plaintiff will not be made whole. The CSAA specifically provides that "[a] plaintiff who prevails in a civil action pursuant to this act shall be awarded damages in the amount of $10,000, plus reasonable attorney's fees, or actual damages, whichever is greater." *N.J.S.A.* 2A:61B–1h. The CSAA defines "actual damages" as "consist[ing] of compensatory and punitive damages and costs of suit, including reasonable attorney's fees." *Ibid.* Under the CSAA, "[c]ompensatory damages may include, but are not limited to, damages for pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, costs of counseling, and lost wages." *Ibid.*