**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3372-18

E.S., as Guardian ad Litem
for G.S. and B.S., minors,

     Plaintiff-Appellant,

v.

BRUNSWICK INVESTMENT
LIMITED PARTNERSHIP, J.E.,
D.L., S.S., and A.T.,

     Defendants-Respondents,

and

F.M.,

     Defendant.

_____

Submitted November 9, 2020 – Decided August 27, 2021

Before Judges Messano, Hoffman, and Suter.

On appeal from the Superior Court of New Jersey,
Law Division, Middlesex County, Docket No.
L-0727-17.

Keefe Law Firm, attorneys for appellant (Stephen T.
Sullivan, Jr., of counsel and on the briefs).

Santomassimo Davis, LLP, attorneys for respondents
(Alexander J. Anglim, of counsel and on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiff E.S., guardian ad litem for her two minor daughters, G.S. (Gloria) and B.S. (Barbara), appeals the Law Division's March 1, 2019 order granting defendants summary judgment.[1] We review the grant of summary judgment de novo, applying the same standard used by the trial court, which

> mandates that summary judgment be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
>
> [Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).]

A dispute of material fact is "genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). "'If there is no genuine issue of material fact,' then we must 'decide whether the trial court correctly interpreted the law.'" Richter v.

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(c)(9).

Oakland Bd. of Educ., 459 N.J. Super. 400, 412 (App. Div. 2019) (quoting DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013)).

Additionally, "[w]e accord no deference to the trial judge's legal conclusions." Ibid. (citing Nicholas v. Mynster, 213 N.J. 463, 478 (2013)). We limit our review to the record before the motion judge. See Ji v. Palmer, 333 N.J. Super. 451, 463–64 (App. Div. 2000) (holding appellate review of the grant of summary judgment is limited to the record that existed before the motion judge (citing Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 (1963))).

I.

From approximately March 1, 2013 until Spring 2015, plaintiff resided in a two-unit residential structure on Commercial Avenue in New Brunswick with her husband, A.S. (Andy), Gloria, Barbara, and a third child. Defendant Brunswick Investment Limited Partnership (Brunswick) owned the premises.[2] Defendant is a property management company that owns and manages residential rental properties and an industrial park in New Brunswick.

---

[2] Brunswick's members included defendants, J.E., A.T. a/k/a A.E., D.L. and S.S. We use the singular, defendant, throughout the opinion, referring to the individual members only as necessary.

The Commercial Avenue property consisted of two units and a detached garage. Apartment A was on the first floor, and Apartment B, where plaintiff and her family lived, was on the second. Apartment B also provided access to the building's attic, which contained living and storage space. Defendant F.M. (Fred) lived in Apartment A from approximately December 1, 2009 through October 22, 2013.

The building had a common front entrance through which one could gain access to both apartment doors. Although there was a lock on the door of the entrance, defendant never provided a key to either plaintiff or her husband, and the door did not automatically lock when closed. Fred kept personal items in the garage, and he was the only person plaintiff or her husband ever saw use the garage. The garage door had a lock, and plaintiff saw Fred use a key on occasion to access the garage. Neither plaintiff nor her husband had a key for the garage, and neither was ever in the garage.

Andy had discovered the availability of the apartment through a friend, who provided a phone number to call. Fred answered Andy's call, set an appointment, and showed Andy the apartment. Neither plaintiff nor Andy knew Fred, who told Andy he was "the maintenance for the house for the company." Fred brought Andy to defendant's office, where he spoke with A.E. and signed the lease. A.E. also confirmed that Fred was "in charge of

4

maintenance."  Plaintiff often paid rent at defendant's office, and Fred was sometimes present.

During her tenancy, plaintiff sublet the attic space to another family. Whenever Andy spoke to defendant about the apartment or the attic space needing work, A.E. told him she would send Fred.  According to plaintiff, Fred did numerous repairs and improvements to Apartment B and the attic, all approved after Andy spoke with A.E.  At times, even when plaintiff or members of the other family were home, Fred used a key he possessed to access Apartment B.

Although Fred executed a lease with Brunswick, J.E. testified at deposition that Fred never paid the monthly rent of $800.  Instead, defendant forgave the rent in exchange for maintenance work Fred performed at the Commercial Avenue and other properties owned by defendant.  Defendant kept no records of Fred's work or compensation, and it did not report that information to any government agencies.  Fred continued to work for defendant after he moved out of the Commercial Avenue property.[3]

---

[3]  At deposition, J.E. insisted Fred never returned to the Commercial Avenue property to do work after he moved out of Apartment A.  J.E. claimed that if Fred went there to work after he vacated Apartment A, it was because the tenants called him and scheduled the work directly.  However, applying summary judgment standards, we accord plaintiff the benefit of all favorable evidence and inferences, meaning that we accept she and Andy arranged for

5

Fred sometimes used defendant's company van. The keys for the van and the garage at the Commercial Avenue property were kept unsecured on a board or in an unlocked cabinet in defendant's office, and it kept no records regarding the use of the keys or van.

Beginning in August 2014 and continuing through February 2015, Fred sexually assaulted Gloria and Barbara on four occasions. According to plaintiff, the first assault happened when Fred met the girls at the property after school and let them into Apartment B while plaintiff and Andy were at work. On another occasion, Fred assaulted one of the girls in the garage. The third assault happened after Fred arrived to do some work in the attic, and, on a fourth occasion, while Fred was painting the bathroom in plaintiff's apartment. Plaintiff first became aware of these assaults after attending a parent-teacher conference at school, where Gloria was experiencing problems. Her daughters then disclosed details of the assaults. Plaintiff and Andy reported these incidents to law enforcement officers who investigated, ultimately interviewing Fred on April 16, 2015.

Fred acknowledged working at several of defendant's properties. He also corroborated some details provided by the children, but he denied committing any sexual assaults. It is unclear what happened thereafter, but a

Fred to perform all work in Apartment B and the attic by contacting defendant for authorization.

 A-3372-18

document in the record indicates that as of April 22, 2015, warrants were issued for Fred's arrest. It is undisputed that Fred absconded and remains at large.

Plaintiff's complaint alleged defendant: was negligent in the "hiring, retention, training and supervision of [Fred]," and also its "negligence permitted . . . [Fred] access to" the children; negligently inflicted emotional distress on Gloria and Barbara; violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50; violated the Child Sexual Abuse Act (CSAA), N.J.S.A. 2A:61B-1; and was vicariously liable under the doctrine of respondeat superior or "agency principles" for various common law torts.[4]

Defendant moved for summary judgment following discovery, arguing that pursuant to the Court's decision in Davis v. Devereux Foundation, 209 N.J. 269 (2012), it could not be vicariously liable as a matter of law for Fred's criminal acts committed outside the scope of his employment. Citing our decision in Davis v. Devereux Foundation, 414 N.J. Super. 1 (App. Div. 2010), aff'd in part, rev'd in part, 209 N.J. 269 (2012), defendant also urged the judge to reject plaintiff's contention that the evidence permitted a finding of vicarious liability pursuant to § 219(2) of the Restatement (Second) of Agency

---

[4] The court dismissed the complaint as to Fred without prejudice pursuant to Rule 1:13-7.

(Am. Law Inst. 1958) (hereinafter <u>Restatement</u>). Defendant also argued it could not be liable as a matter of law for the negligent hiring, training, or supervision of Fred, as it was undisputed it did not know of any prior criminal conduct by Fred and had received no complaints about him.

After considering oral argument, the judge granted defendant's motion, explaining his rationale in a written opinion. Citing <u>Restatement</u> § 228, the judge first determined Fred's actions were clearly outside the scope of his employment. The judge then considered § 219(2), which provides:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> (a) . . .
>
> (b) the master was negligent or reckless, or
>
> (c) . . .
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, <u>or</u> he was aided in accomplishing the tort by the existence of the agency relation.
>
> [<u>Restatement</u>, § 219 (emphasis added).][5]

---

[5] This section only applies to those in a master-servant relationship. <u>See</u> <u>Restatement</u> § 220 (defining who is a servant, as opposed to an agent).

Noting plaintiff's reliance in opposing summary judgment on subsections (2)(b) and (d), the judge correctly observed that the Court never specifically addressed those subsections in <u>Davis</u>. Relying on our decision in <u>Davis</u>, the judge concluded subsection (d) did not apply to low-level employees, like Fred. 414 N.J. Super. at 15–16.

The judge then considered subsection (b), noting plaintiff's argument that defendant did nothing to prevent Fred's unauthorized use of keys to Apartment B or the garage. He concluded that plaintiff failed to "put forth any proof of a relevant standard of care regarding supervision of maintenance workers, or key sign-out or security procedures," and lacked "the benefit of any expert to establish . . . a standard of care, let alone a deviation." The judge also determined that Fred's criminal acts "were not foreseeable." He entered an order dismissing the complaint, and this appeal followed.

## II.

Plaintiff contends no expert testimony was necessary to permit a jury to find defendant was directly negligent in failing to keep the common door to the Commercial Avenue property locked and the keys to Apartment B and the garage secured and their use monitored, thereby making defendants liable under § 219(2)(b) of the <u>Restatement</u>. Plaintiff also argues there was sufficient evidence to permit a jury to find defendant vicariously liable under §

9

219(2)(d), because a jury could find Fred acted with apparent authority and was aided in accomplishing the sexual assaults through his position as defendant's employee. She disagrees with the judge's conclusion that Fred was a "low-level employee," or otherwise not within the scope of § 219(2)(d) of the Restatement.[6]

We digress briefly to address defendant's continued assertion that the Court's holding in Davis "is decisive" and readily disposes of the appeal. It does not.

In Davis, the plaintiff, almost nineteen years old and diagnosed with autism and other serious psychological and behavioral conditions, resided for several years in the defendant's facility. 209 N.J. at 279. One of the facility's resident counselors severely burned the plaintiff by throwing a scalding cup of water on him. Id. at 281. The counselor pled guilty and was sentenced to prison for her crimes. Ibid.

On appeal, we agreed with the motion judge and rejected the plaintiff's argument that the defendant had a non-delegable duty to the plaintiff, thereby

---

[6] The judge did not address plaintiff's LAD claim or her CSAA claim. However, plaintiff's brief does not challenge the grant of summary judgment on these counts in her complaint. Any appeal from summary judgment on those claims is waived. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) (holding an issue not briefed is deemed waived on appeal).

making it vicariously liable under § 219(2)(c) of the Restatement. Davis, 414 N.J. Super. at 8–10. However, we reversed the grant of summary judgment, concluding a jury could find the counselor's conduct was within the scope of her employment. Id. at 12–16.

In granting certification, the Court limited its consideration to only two issues:

> whether New Jersey law imposed upon [the defendant] a "non-delegable duty" to prevent [the counselor's] assault upon [the plaintiff] within the meaning of Restatement § 219(2)(c), and whether a rational factfinder could find that [the counselor's] violent conduct was within the scope of her employment under Restatement § 219(1).
>
> [Davis, 209 N.J. at 288.]

In other words, the motion judge in this case correctly determined that the Davis Court never addressed the two subsections of § 219(2) at issue here.

The motion judge, however, extended our dicta in Davis beyond its intended bounds. Specifically, we saw "no basis for applying" § 219(2)(d) in Davis. 414 N.J. Super. at 15. Noting the Court's application of § 219(2)(d) in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 620 (1993), we decided not to

> explore other possible meanings of [§ 219(2)(d)] since we are satisfied that it would be inappropriate to apply it to the conduct of a low-level employee in the instant setting. We reach that conclusion because such an application would result in strict liability, which is inconsistent with the Court's implicit rejection of strict

11

> liability in <u>Hardwicke</u> [v. American Boychoir School,
> 188 N.J. 69 (2006)].
>
> [<u>Id.</u> at 16.]

The motion judge construed this dictum to mean criminal conduct by a low-level employee could never support holding his employer vicariously liable under § 219(2)(d) of the <u>Restatement</u>. We do not accept that as a rule, but, rather, limit our statement in <u>Davis</u> to the facts presented.

However, we agree that the motion judge in this case properly granted summary judgment, albeit in part for reasons other than those expressed in his written opinion. <u>See</u> <u>Hayes v. Delamotte</u>, 231 N.J. 373, 387 (2018) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting <u>Do-Wop Corp. v. City of Rahway</u>, 168 N.J. 191, 199 (2001))). As we explain, our courts have applied § 219(2)(b) and (d) of the <u>Restatement</u> in limited circumstances, generally serving remedial statutory causes of action, none of which are present here. Moreover, the <u>Restatement (Third) of Agency</u> (Am. Law Inst. 2006) (hereinafter <u>Restatement Third</u>), which the Court and our court has adopted in other settings, significantly altered § 219(2) of the earlier <u>Restatement</u>, lending further support to our conclusion that defendants are not liable as a matter of law under the facts of this case.

III.

A.

These two subsections of the Restatement are conceptually different. In Aguas v. State, in the context of a sexual harassment complaint, the Court clarified that claims implicating § 219(2) of the Restatement "are often discussed in tandem, [but] are analytically distinct from and independent of one another." 220 N.J. 494, 512 (2015). "The first is a direct cause of action against the employer for negligence or recklessness under Restatement § 219(2)(b)." Ibid. (emphasis added) (citing Gaines v. Bellino, 173 N.J. 301, 312–14 (2002)). "The second is a claim for vicarious liability under Restatement § 219(2)(d)." Ibid. (emphasis added) (citing Gaines, 173 N.J. at 312–14).

The Court has applied § 219(2)(b) and (d) of the Restatement to hold an employer potentially liable for the acts of its employee outside the scope of his employment only in limited circumstances. In each instance, the Court did so to serve the clear purposes of remedial legislation.

In Lehmann, the Court held that the second portion of § 219 (2)(d) of the Restatement — the employee "was aided in accomplishing" his tortious conduct "by the existence of the agency relation" — could apply to hold an employer vicariously liable for a supervisor's creation of a hostile work

13

environment under the LAD.[7]  132 N.J. at 619–20.  Critically, in order to impose liability under the second portion of § 219(2)(d), the factfinder must conclude, among other things, that "the employer delegate[d] the authority to the supervisor <u>to control the situation of which the plaintiff complains</u>."  <u>Id.</u> at 620. (emphasis added) (quoting Bruce Chandler Smith, <u>When Should an Employer Be Held Liable For The Sexual Harassment by a Supervisor Who Creates a Hostile Work Environment? A Proposed Theory of Liability</u>, 19 Ariz. St. L.J. 285, 321 (1987)).

The Court also held an employer could be liable under § 219 (2)(b) of the <u>Restatement</u> if a plaintiff could "show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms."  <u>Id.</u> at 621.  The Court specifically declined to hold employers "strictly liable for hostile work environment sexual harassment by supervisors."  <u>Id.</u> at 623.  Instead, the Court viewed the "scope of an employer's liability . . . as a question of public policy" with "the crucial issue

---

[7] This second portion of subsection (d) has been referred to by some courts as the "aided by the agency exception to employer nonliability." <u>Zsigo v. Hurley Med. Ctr.</u>, 716 N.W.2d 220, 224 (Mich. 2006).  Others have referred to it as the "aided-in-agency theory" of vicarious liability.  <u>See, e.g.</u>, <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1116–31 (D.N.M. 2015) (tracing the history and development of this portion of <u>Restatement</u> § 219(2)(d)).

to be which position provides the most effective intervention and prevention of employment discrimination." Id. at 625.

In Abbamont v. Piscataway Township Board of Education, the Court held "that the standards governing employer liability as determined and explained in [Lehmann were] fully applicable to actions brought under CEPA [the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14]." 138 N.J. 405, 417 (1994). Like the LAD, CEPA "seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Id. at 418. Justice Handler noted that similar "considerations of public policy inform[ed the Court's] analysis of the scope of employer liability for retaliatory conduct under CEPA." Id. at 417.

Lastly, in Hardwicke, the Court considered whether the defendant school could be vicariously liable under the CSAA for sexual assaults committed against a former student by the school's musical director. 188 N.J. at 74. After concluding the school could be a "passive abuser" under the statute, id. at 91–94, the Court considered whether the school could be vicariously liable for the plaintiff's common law tort claims based on the musical director's sexual assaults. Id. at 100–01. Once again, relying in part on the strong public policy undergirding the CSAA, the Court held:

The considerations that informed our analyses in Lehmann and Abbamont apply equally to claims predicated on facts indicating child abuse. . . . [T]he CSAA recognizes the vulnerability of children and demonstrates a legislative intent to protect them from victimization. In our view, common-law claims based on child abuse are supported by the same compelling rationale. The CSAA imposes responsibility on those in the best position to know of the abuse and stop it; application of section 219 of the Restatement to plaintiff's common-law claims advances those goals.

[Id. at 102.][8]

B.

Plaintiff cites no published New Jersey decision that adopted § 219(2)(b) of the Restatement to impose direct liability on an employer for the tortious conduct of an employee outside the scope of his employment other than in the context of claims brought pursuant to remedial legislation such as the LAD, CEPA or the CSAA, and our research reveals none. See Davis, 414 N.J.

---

[8] As noted, the motion judge did not specifically address the CSAA count in the complaint, nor has plaintiff done so on appeal. Defendant and its individual members were not in loco parentis to Barbara and Gloria or within their "household," and, therefore, could not be vicariously liable as "passive abusers" under the CSAA. See e.g., J.P. v. Smith, 444 N.J. Super. 507, 512–13 (App. Div. 2016) (concluding school and board of education could not be liable for assistant band director's sexual abuse of student at school, in her home, and on overnight band trips).

Super. at 11 (noting "the legal principles set forth in the <u>Restatement</u> are intended to be summaries of the common law" and "liability under [such remedial legislation] is solely a matter of statutory construction").

Indeed, a survey of decisions from other jurisdictions reveals no published case, other than those brought under similar remedial statutes, that relied upon § 219(2)(b) to impose direct liability on an employer for the torts of an employee committed outside the scope of his employment. Simply put, it remains unclear what would make an employer negligently culpable under § 219(2)(b) for a common law tort committed by an employee outside the scope of his employment.

The question has been made clearer by the <u>Restatement Third</u>, which our Courts have recognized and adopted in several circumstances. <u>See</u> <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 229 (2015) (citing <u>Restatement Third</u> regarding fiduciary's duty of loyalty to principal); <u>Bridgewater-Raritan Educ. Ass'n v. Bd. of Educ.</u>, 221 N.J. 349, 363–64 (2015) (citing <u>Restatement Third</u> regarding "apparent authority"); <u>N.J. Laws.' Fund for Client Prot. v. Stewart Title Guar. Co.</u>, 203 N.J. 208, 220 (2010) (same); <u>Gayles v. Sky Zone Trampoline Park</u>, ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 12–13) (same); <u>Dunkley v. S. Coraluzzo Petroleum Transporters</u>, 441 N.J. Super. 322, 328 n.1 (App. Div. 2015) (specifically noting the "<u>Restatement (Second) of Agency</u> has been

17

superseded by <u>Restatement (Third) of Agency</u> (2006)."). The <u>Restatement Third</u> makes clear that the principal-employer is directly liable for the agent-employee's conduct "if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." <u>Id.</u> at § 7.05(1).

Such liability may arise "for injury caused by tortious conduct of an employee acting outside the scope of employment." <u>Id.</u> cmt. b. In other words, under the <u>Restatement</u>'s latest iteration, "[t]he basis for liability under this rule is distinct from other bases for liability." An employer's liability for torts committed by its employee outside the scope of his employment "stem[s] from general doctrines of tort law not limited in their applicability to relationships of agency." <u>Ibid.</u>

Nonetheless, there must be a "foreseeable likelihood that harm will result from the conduct." <u>Id.</u> cmt. d. As the <u>Restatement Third</u> explains, "When a principal conducts an activity through another person, the nature of the task to be performed and the conduct required for performance are relevant to whether the principal acted negligently, either in selecting the actor or in instructing, supervising, or otherwise controlling the actor." <u>Ibid.</u>

18

Plaintiff does not specifically challenge dismissal of her claims alleging defendant's negligent hiring, training, and supervision of Fred. Nevertheless, we briefly address the issue in light of the Restatement Third's commentary.

"Unlike respondeat superior, negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer." G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019). Our courts have long recognized the elements of such a cause of action.

> To be found liable for negligent supervision or training, the plaintiff must . . . prove that (1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages.
>
> [Id. at 416 (citing DiCosala v. Kay, 91 N.J. 159, 173 (1982)).]

The motion record is devoid of any facts demonstrating defendant knew or should have reasonably known that Fred posed a risk to any tenant. Plaintiff's negligent supervision cause of action, therefore, was properly dismissed.

Plaintiff takes a somewhat different tack by arguing defendant was directly negligent by failing to supply adequate security against criminal conduct at the Commercial Avenue property, including Fred's criminal conduct. She cites the failure to install a working lock on the front door of the property and defendant's failure to secure and monitor keys to the property as

19

independent bases for liability.  See, e.g., Trentacost v. Brussel, 82 N.J. 214, 222 (1980) (holding landlord could be liable for failing "to install a lock on the front door").  Plaintiff also argues the judge erred by concluding expert opinion was necessary to establish defendant's negligence.  While we agree with plaintiff that an expert was not necessary to establish that defendant owed a duty to plaintiff, or that the facts in this case established a breach of the duty, we nevertheless conclude summary judgment was appropriate.

No evidence suggested that when defendants authorized Fred to make repairs and improvements as requested by plaintiff's family, it was foreseeable that Fred would engage in criminal conduct.  This case is, therefore, unlike Trentacost, where the Court noted the mugging and robbery of a tenant in an apartment building's stairwell was reasonably foreseeable based on the high incidence of crime in the area and an attempted break-in to the building's basement two months before the attack.  82 N.J. at 223.  The same foreseeability of harm from another's conduct was essential to holding a landlord potentially liable in any number of other cases.  See, e.g., Scully v. Fitzgerald, 179 N.J. 114, 122 (2004) ("A landlord . . . has a responsibility to take reasonable steps to curtail the dangerous activities of tenants of which he should be aware and that pose a hazard to the life and property of other tenants." (emphasis added) (citing Williams v. Gorman, 214 N.J. Super. 517,

20

523 (App. Div. 1986))); Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 504 (1997) ("[B]usiness owners and landlords have a duty to protect patrons and tenants from foreseeable criminal acts of third parties occurring on their premises." (emphasis added)).

Moreover, even if these omissions demonstrate a breach of the duty defendant owed to its tenant and her family, plaintiff's negligence claim still fails. "[A] negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Est. of Campagna v. Pleasant Point Props., LLC, 464 N.J. Super. 153, 171 (App. Div. 2020) (alteration in original) (quoting Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013)). Defendant's failure to install a lock on the front door of the Commercial Avenue property or safeguard keys at its office were not proximate causes of the sexual assaults of plaintiff's daughters. Fred was not a third-party stranger to the property, nor was he simply plaintiff's fellow tenant. Indeed, it is part and parcel of plaintiff's argument pursuant to § 219(2)(d) of the Restatement, which we address below, that Fred was provided with unique access to the property because Brunswick authorized his presence as the building's superintendent.

21

In sum, plaintiff failed to present a prima facie case under § 219(2)(b) of the Restatement, as now superseded by Restatement Third § 7.05, that defendant's negligence made it directly liable for Fred's criminal conduct committed outside the scope of his employment.

C.

Plaintiff contends she presented a prima facie case of defendant's vicarious liability pursuant to § 219(2)(d) of the Restatement. This subsection presents two alternative methods for establishing an employer's vicarious liability for the tortious conduct of its employee outside the scope of his employment — the employee "purported to act . . . on behalf of the principal and there was reliance upon apparent authority"; or the tortfeasor was "aided in accomplishing the tort by the existence of the agency relation." Restatement, § 219(2)(d). The limited commentary to the rule provides:

> Clause (d) includes primarily situations in which the principal's liability is based upon conduct which is within the apparent authority of a servant, as where one purports to speak for his employer in defaming another or interfering with another's business. Apparent authority may also be the basis of an action of . . . physical harm. In other situations, the servant may be able to cause harm because of his position as agent . . . .
>
> [Id. cmt. e (emphasis added) (citations omitted).]

A-3372-18

The Restatement specifically recognized vicarious liability for "physical harm" to third parties "caused . . . by their reasonable reliance upon the tortious representations of one acting within his apparent authority or apparent scope of employment." Restatement, § 266 (emphasis added). The comment and illustrations that follow limit the section's application to situations where physical harm results from an employee's misrepresentation or negligent representation. Id. cmt. a.

We note once again, however, that except in the context of causes of action under remedial statutory schemes, plaintiff fails to cite any published New Jersey decision that relied on § 219(2)(d) of the Restatement as a basis for vicarious liability, and we have found none in our research. We also note our concern that an overly broad application of § 219(2)(d) in other settings treads perilously close to imposing strict liability on an employer. Davis, 414 N.J. Super. at 16.

(i)

We first deal with the "aided-by-agency" clause of § 219(2)(d) of the Restatement. Courts in other jurisdictions have expressed concern that a broad reading of its language would result in an employer's strict liability. See, e.g., Peña, 110 F. Supp. 3d at 1118 ("point[ing] out the obvious defect in the aided-in-agency theory: it comes close to creating strict vicarious liability for

23

employers, and, despite purporting to be an exception, it nearly swallows the general rule that respondeat superior does not attach to intentional torts"); Zsigo, 716 N.W.2d at 224, 226 (refusing to "adopt[] the aided by the agency exception" in subsection 2(d) because it "would potentially be subjecting employers to strict liability"). See also Peña 110 F. Supp. 3d at 1119–20 (explaining the split among courts in applying the rule in § 219(2)(d)).

In Lehmann, the Court explained the doctrine as providing vicarious liability for an employer because the creation of a hostile work environment by a supervisor depends on whether he or she "was <u>aided in accomplishing that tort by the power delegated</u> . . . to control the day-to-day working environment." 132 N.J. at 620 (emphasis added). Several courts in other jurisdictions that have recognized the aided-by-agency doctrine for vicarious liability under § 219(2)(d) have limited its application to similar workplace torts involving sexual harassment, or to situations where the tortfeasor was a police officer or other law enforcement official who, through his position, was able to exert power and control over the victim. See Peña, 110 F. Supp. 3d at 1125–29 (collecting cases).

One notable exception, with facts similar to those presented here, was <u>Costos v. Coconut Island Corp.</u>, 137 F.3d 46 (1st Cir. 1998). In that case, the First Circuit anticipating Maine's common law, concluded that pursuant to the

24 <span>A-3372-18</span>

aided-by-agency doctrine, the owners of an inn could be vicariously liable for its manager's surreptitious entry of a guest's room and her rape. Id. at 50. The court noted that "[b]y virtue of his agency relationship with the defendants, as manager of the inn, [the manager] was entrusted with the keys to the rooms, including [the victim's] room . . . . Because he was the manager of the inn, [he] knew exactly where to find [the victim]." Ibid.

The Supreme Court of Maine, however, has since noted the widespread criticism of Costos and specifically rejected its application in Mahar v. StoneWood Transport, 823 A.2d 540, 546 (Me. 2003). As one commentator aptly noted:

> Viewed in isolation, the aided-by-agency-relation basis for liability in section 219(2)(d) could embrace a wide array of cases. As courts have noted, in almost all vicarious liability cases the mere "existence of the agency relation" aids the employee in accomplishing the tort because the agent often would not have committed the tort but for the responsibilities, duties, and knowledge gained from the existence of the agency relationship. Courts, however, typically explain that such a reading goes too far. The agency relation by itself could expose the employer to nearly limitless liability, involving situations that fall well beyond a fair assessment of the employer's responsibility.
>
> [Daniel M. Combs, Note, Costos v. Coconut Island Corp.: Creating a Vicarious Liability Catchall Under the Aided-by-Agency-Relation Theory, 73 U. Colo. L. Rev. 1099, 1105 (2002).]

The Restatement Third entirely eliminated the "aided-by-agency" doctrine of vicarious liability by adopting § 7.03(2), which states:

> A principal is subject to vicarious liability to a third party harmed by an agent's conduct when
>
> (a) . . .
>
> (b) as stated in § 7.08, the agent commits a tort when acting with apparent authority in dealing with a third party on or purportedly on behalf of the principal.

[Restatement Third, § 7.03(2).]

The accompanying comments make clear the Restatement Third's intention and reasoning.

> This Restatement does not include "aided in accomplishing" as a distinct basis for an employer's . . . vicarious liability. The purposes likely intended to be met by the "aided in accomplishing" basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents. See § 7.05.

[Id. § 7.08 cmt. b.]

Courts have split on the continued vitality of the "aided-by-agency" exception to an employer's nonliability in light of the Restatement Third. Compare Pearce v. Werner Enters., Inc., 116 F. Supp. 3d 948, 954–57 (D. Neb. 2015) (discussing history of disagreements regarding the scope of the clause, its

26

elimination from the <u>Restatement Third</u>, and predicting that the Nebraska Supreme Court would not adopt the aided-by-agency rule, which "has proven contentious and difficult to apply, and has been disavowed by its creators"), with <u>Peña</u>, 110 F. Supp. 3d at 1130–35 (predicting New Mexico Supreme Court would continue to follow the aided-by-agency rule "where the tortfeasor's relationship with his employer gives him 'extraordinary power' over his victim" (quoting <u>Doe v. Forrest</u>, 853 A.2d 48, 61 (Vt. 2004))).

Our Court has never applied the aided-by-agency exception to employer nonliability in any circumstance other than those remedial statutes designed to eradicate workplace discrimination and harassment, to protect conscientious employees, or to protect children from abuse by those in loco parentis. We need not anticipate whether the Court would apply the exception in other circumstances. Other jurisdictions that have applied the doctrine outside such situations have done so only if the employee-tortfeasor was in a position to exercise unique power over the victim. <u>See</u> <u>Sherman v. State Dep't of Pub. Safety</u>, 190 A.3d 148, 154–55 (Del. 2018) (holding that "if a police officer makes a valid arrest and then uses that leverage to obtain sex from his arrestee, his misconduct need not fall within the scope of his employment . . . to trigger his employer's liability" given "the unique, coercive authority entrusted in . . . police under Delaware law"); <u>Spurlock v. Townes</u>, 368 P.3d 1213, 1216–17

27

(N.M. 2016) (applying the theory to a corrections officer); <u>Doe</u>, 853 A.2d at 60–67 (applying the theory to sexual assault by a police officer, based in part on the "extraordinary power that a law enforcement officer has over a citizen"). These limitations, together with the American Law Institute's repudiation of the doctrine in the <u>Restatement Third</u>, convinces us the aided-by-agency exception to employer nonliability does not apply to the facts of this case.

(ii)

That leaves plaintiff's claim that Fred's apparent authority provides a basis for defendant's vicarious liability under <u>Restatement</u> § 219 (2)(d). We disagree.

First, as the <u>Restatement</u>'s commentary makes clear, vicarious liability for an employee's torts committed outside the scope of employment is limited to "situations in which the principal's <u>liability is based upon conduct which is within the apparent authority</u> of a servant." <u>Restatement</u>, § 219 cmt. e (emphasis added). In <u>Jean-Charles v. Perlitz</u>, the district court applied Connecticut law to consider whether the defendants were vicariously liable for the sexual abuse of school children by their employee, Perlitz, who was the school's founder. 937 F. Supp. 2d 276, 279–81 (D. Conn. 2013). In dismissing the plaintiffs' claims for vicarious liability, and addressing §

219(2)(d), the court noted "Connecticut courts have consistently declined to apply the doctrine of apparent authority in tort cases, notwithstanding the principles of agency set forth in the <u>Restatement (Second)</u>." <u>Id.</u> at 286. More importantly, the court held "the allegations of the complaint taken as a whole do not support a plausible inference that <u>the moving defendants held out Perlitz as authorized</u> to engage in sexual exploitation of the plaintiffs." <u>Id.</u> at 287 (emphasis added). Here, plaintiff seeks to hold defendant vicariously liable for Fred's sexual assaults, committed not only outside the scope of his employment but <u>outside the apparent authority</u> conferred on Fred by defendant and represented as such to plaintiff to make repairs at the Commercial Avenue property.

As to vicarious liability for the torts of an employee based on apparent authority, the <u>Restatement Third</u> provides:

> A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal <u>when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission</u>.
>
> [<u>Id.</u> at § 7.08 (emphasis added).]

Critically, in explaining the contours of apparent authority, the <u>Restatement Third</u> clarifies: "Apparent authority holds a principal accountable <u>for the results of third-party beliefs about an actor's authority to act as an agent when</u>

the belief is reasonable and is traceable to a manifestation of the principal."

Restatement Third, § 2.03 cmt. c (emphasis added).

The commentary to § 7.08 explains:

> The torts to which this section applies are those in which an agent appears to deal or communicate on behalf of a principal and the agent's appearance of authority enables the agent to commit a tort or conceal its commission. Such torts include fraudulent and negligent misrepresentations, defamation, tortious institution of legal proceedings, and conversion of property obtained by an agent purportedly at the principal's direction.
>
> [Restatement Third, § 7.08 cmt. a.]

The commentary also explains the rationale behind the rule.

> Apparent-authority doctrine thus focuses on the reasonable expectations of third parties with whom an agent deals. This focus is inapposite to many instances of tort liability. . . . [A]pparent authority . . . is operative in explaining a principal's vicarious liability when a third party's reasonable belief . . . stems from a manifestation made by the principal and it is through statements or dealings that the agent acts tortiously.
>
> [Id. cmt. b (emphasis added).]

The commentary makes clear there must be some nexus between the principal's manifestation of authority and the agent's tortious conduct.

> A principal is not subject to liability under the rule stated in this section unless there is a close link between an agent's tortious conduct and the agent's apparent authority. Thus, a principal is not subject to

> liability when actions that an agent takes with apparent authority, although connected in some way to the agent's tortious conduct, do not themselves constitute the tort or enable the agent to make its commission.
>
> [Ibid. (emphasis added).]

The Reporter's notes to this section of the Restatement Third explain that "[a]pparent authority rarely serves as a basis for liability when an employee . . . commits an intentional physical tort." Ibid.

The nexus between the employee's authority and the tortious conduct that made his employer vicariously liable was clear in Schierts v City of Brookfield, 868 F. Supp. 2d 818 (E.D. Wis. 2012). There, a police officer used his position to conduct a motor vehicle record search on behalf of a female friend, the plaintiff's ex-wife, in violation the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721–2725. Id. at 819. Citing Restatement Third § 7.08, the court rejected the city's argument that it could not be vicariously liable for its former officer's conduct, holding "there is no dispute that [the officer] acted with the apparent authority of the [c]ity . . . when he obtained [the plaintiff's] addresses from the Arizona Department of Transportation for an impermissible purpose." Id. at 822.

On the other hand, in construing § 7.08 of the Restatement Third, the Supreme Court of Maine concluded that a camp could not be vicariously liable

31

for the sexual assault of a female camper by a volunteer camp counselor months after camp ended. Gniadek v. Camp Sunshine at Sebago Lake, Inc., 11 A.3d 308, 317 (Me. 2011). Citing the commentary mentioned above and its predecessor section, Restatement § 219(2)(d), the court noted that it did not "encompass assaultive and threatening conduct by an employee who did not purport to act on his employer's behalf." Ibid. (citing Mahar, 823 A.2d at 545–46). See also Picher v. Roman Cath. Bishop of Portland, 974 A.2d 286, 296 (Me. 2009) (discussing and holding on remand, that the court should consider §§ 7.07 and 7.08 of Restatement Third in the context of the plaintiff's limited claim that the defendant bishop was vicariously liable for fraudulently concealing knowledge of priest's "propensity . . . to commit sexual misconduct").

Here, the motion record demonstrated that defendant authorized Fred to act as its agent to make repairs and otherwise maintain the Commercial Avenue property. That is the only authority that plaintiff and her family could have reasonably relied upon in permitting him access or otherwise not objecting to his access. To hold defendant vicariously liable for Fred's heinous criminal conduct, plaintiff was required to demonstrate that defendant provided Fred with more than "merely the opportunity" to commit the crime. Peña, 110 F. Supp. 3d at 1135. There was no such proof in this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3372-18